George F. Caylor v. The State.

2312.   Decided June 11, 1902.

**1.—Accessory—What Constitutes.**

In order to constitute one an accessory after the fact, there must be some aid rendered to the principal direct.

**2.—Same—Rape—Inducing Prosecutrix to Leave the Country.**

On a trial as an accessory after the fact to a rape, evidence is insufficient to support the conviction which merely shows that defendant induced the prosecutrix to leave the State in order that she might not be had as a witness before the grand jury to testify as to the rape upon her by the alleged principal. Distinguishing Blakeley v. State, 24 Texas Crim. App., 617.

Appeal from the District Court of Baylor. Tried below before Hon. J. A. P. Dickson.

Appeal from a conviction of accessory to rape; penalty, five years imprisonment in the penitentiary.

The opinion below sets out both the indictment and the facts adduced in evidence.

*Glasgow & Kennan* and *L. W. Dalton,* for appellant.—To constitute one an accessory after the fact three conditions must exist: First, the felony must be complete; second, the accessory must have knowledge that the principal committed the felony; third, the accessory must render aid and assistance to the principal felon.

The court erred in not setting aside the verdict and granting a new trial because of the insufficiency of the evidence, in this, that here is no testimony showing that the defendant in any way assisted Tony McDonald in getting away or otherwise, as charged in the indictment, and that and that he only helped Ivy Benton off, if he did anything, and therefore the crime as alleged was not proven.

*Rob't A. John,* Assistant Attorney-General, for the State.—The indictment alleges in proper terms the commission of the crime of rape by Tony McDonald, and alleges that his said crime occurred about the 12th day of May, 1901, and that subsequently on May 27th, appellant, knowing the commission of the crime of his principal, McDonald, unlawfully and willfully proceeded to give aid, etc. The indictment complies with the forms approved and with the precedents laid down in the decisions. Willson's Crim. Forms, No. 539.

The indictment is an almost exact duplicate of Gann v. State, 57 S. W. Rep., 837; Dent v. State, 3 Texas Ct. Rep., 606, 43 Texas Crim. Rep., 126; Blakeley v. State, 24 Texas Crim. App., 622.

The facts are that on June 4, 1901, Tony McDonald was indicted by the grand jury of Baylor County for the offense of rape; on Saturday before the Monday that this case was to be investigated by the grand jury, at the June term, 1901, of said court, this appellant contributed $20 to secure witness Ivy Benton's flight to the Indian Territory; that he advised the flight; that he accompanied the said witness to Wichita. The surrounding circumstances clearly show that the purpose was to aid the said McDonald, because her presence as a witness would have inevitably procured an indictment. The accomplice testimony on this issue is amply sustained by circumstances. She being the only witness to the crime or rape committed upon her by McDonald, the placing of her without the jurisdiction of the court was such aid as would defeat the State in prosecuting the said McDonald for this crime. This case is a kindred case to Blakely v. State, 24 Texas Crim. App., 617, where the issue was specifically presented

BROOKS, JUDGE.—The following is the charging part of the indictment under which appallant was tried: "That Tony McDonald, on or about the 12th day of May,, A. D. 1901, * * * in and upon Ivy Benton, a female, then and there under the age of fifteen years, did make an assault, and the said Tony McDonald did then and there ravish and have carnal knowledge of the said Ivy Benton, the said Ivy Benton not being then and there the wife of the said Tony McDonald; and the grand jurors aforesaid upon their oaths do further present in said court, that George Caylor on or about the 27th day of May, A. D. 1901, in the county and State aforesaid, after the commission of said offense by the said Tony McDonald, and well knowing the said Tony McDonald to have committed said offense, did unlawfully and willfully conceal and give aid to the said Tony McDonald in order that he, the said Tony McDonald, might evade an arrest and trial for said offense," etc. Under the plea of not guilty, the jury returned the following verdict: "We the jury find the principal Tony McDonald guilty as charged in the indictment herein, and find the defendant George Caylor guilty as an accessory to the said principal as charged in the indictment, and assess the punishment of said defendant George Caylor at confinement in the penitentiary for a term of five years."

The testimony adduced on the trial material to the issues is substantially as follows: Mrs. Mattie Benton testified: That she is the mother of Ivy Benton, who died on August 22, 1901. She was 14 years old, unmarried and not the wife of Tony McDonald. Witness was living in Seymour during the June term, 1901, of the District Court, which convened on the first Monday in June. "On Friday night before court convened, defendant Caylor came to my house and said he had heard he had been accused of ruining my daughter Ivy, and that he had not done so, but he was satisfied Tony McDonald was the man who had ruined her; that it would be best for me and Ivy and all parties concerned, for Ivy to be sent out of the country. He suggested that Ivy be sent out of the country, and said that J. C. Manning would go with her. Witness told him that she did not have the money, and he said he would give her $20. On the following Sunday evening Caylor came to witness's house again, and gave the $20 to Manning in my presence, and again said that it would be best to send Ivy away. I told him that I would send Ivy down to the depot on the next Monday in the wagonette, and Caylor said no; that he would send a buggy down for her, and that I could take her down to the depot in the buggy. He said that he did not want Ivy to go in the wagonette; that it would not do for her to be riding around in the wagonette, as the officers might see her and catch on. Caylor sent the buggy down on Monday morning, and I took Ivy to the train on it. I saw Manning and Caylor at the depot, and they took Ivy and went off on the train. They told me that Ivy was going to Roswell, New Mexico. The next day Caylor returned and told me that Manning and Ivy bought their tickets at Wichita Falls for Roswell; that he saw them buy their tickets before they left and that he gave Ivy $7 more at Wichita Falls.

After the last district court, some time about July 18 or 19, 1901, Caylor came to my house and wanted me to take Ivy and leave. I told him that Wheat and Coombes wanted me to leave, too, and go back to the farm. He said, 'Yes; but they did not want us to leave and get clear out of the country.' He furnished me a hack and team, and we left in the night. I took Ivy and the children with me after night, and drove out east of town and past Judge Newton's place; and Caylor, Steed and Roscoe Rayburn came to us.. Caylor said that Rayburn would go with us and furnish everything we needed. Caylor and Steed then came back to town, and Rayburn went with Ivy and I, and took us to Jacksboro. Before we left Seymour, Caylor had me to sign a note to him for $125, and sign a power of attorney to all my property, and sign an affidavit. Ivy was pregnant when we left for Jacksboro, and died in a day or so after we returned."

On cross-examination she stated: "George Blythe, a deputy sheriff, and who married my husband's half-sister, came to my house about a week after Ivy left for Roswell, and inquired where Ivy had gone. I hold him that Ivy had gone to her uncle's in Fannin County. I told him that because Caylor told me to tell anyone who inquired where Ivy was that she had gone there. On Monday morning Caylor came to my

house and suggested that I send for Suttlemyer, the deputy sheriff; and I told defendant to send him up. Suttlemyer came up, and I told that Tony McDonald had ruined my daughter, and that I wanted him punished for it. I told him about Ivy going to New Mexico. Tony McDonald first met Ivy in December, 1900. I had a good many business transactions with defendant; bought an organ and machine from defendant, giving my notes for the organ and balance on machine. I am now in debt to defendant. Defendant was to give Ivy music lessons, and was at my house a good many times." Defendant then exhibited to her an affidavit, which she admitted signing, because defendant said he wanted it to keep him out of trouble; that she signed it before D. L. Kenan, a notary public, who read the same over to her, who came to her house with Caylor.

This affidavit states substantially that affiant's daughter. Ivy Benton, left Seymour about May 27, 1901, with J. C. Manning, going to Roswell, New Mexico; that it was necessary to raise a sufficient sum to pay her expenses, and on May 25th she arranged to borrow $20 from Caylor; that affiant told Caylor she was going to send her daughter to her uncle's in Fannin County, and did not have money to defray her expenses, and Caylor agreed to lend affiant $20. That on May 27th affiant sent Manning to Caylor to get the $20 Caylor had promised to lend her, which he procured. That said $20 was a loan by Caylor and was made upon the promise to repay said sum at a date not later than the fall of 1901, out of her crop. That affiant offered to secure Caylor, but he demanded no security, having no doubt about the repayment. Affiant states that Caylor has been at her house on a number of occasions since her residence in Seymour, and has at all times conducted himself as a gentleman, and at no time has he shown a disposition to have carnal knowledge of affiant's daughter, Ivy Benton; that if said Caylor had had sexual knowledge of affiant's daughter affiant would have known it. This affidavit is signed and sworn to by Mattie Benton before D. L. Kenan, notary public, on July 22, 1901.

She further testified that defendant furnished her with a hack and team to go to Jacksboro, and took her note for $125 and a mortgage on the hack and team. "Defendant said it was to protect him, and I was in debt to him when we left. I owed defendant three notes of $13.75 each when I left for Jacksboro. I did not buy the hack and team from defendant—he just turned it over to me, and took my note. When I returned from Jacksboro defendant took the hack and team back. He sold my two cows and calves, while I was gone, under the power of attorney I gave him. He has never accounted to me for the cows and calves. There was no consideration for the $125 note; I never owed defendant anything except the three notes. Defendant said when he sent us off with Rayburn he would take us to Paris, but we never got there. Ivy was confined at Jacksboro, and we came back to Round Timbers. The affidavit I made before Kenan is in all things false. It

was read over to me before I signed it, but I never paid any attention to the reading."

A. L. Board testified that during the first week of the last term of court he went to Roswell, New Mexico, and got Ivy Benton, and brought her to Seymour, before the grand jury. En route Caylor met us at Wichita Falls and came back with us.

The State then introduced the verdict and judgment in the case of the State of Texas v. Tony McDonald, No. 710, rendered July 4, 1901, wherein Tony McDonald was convicted for rape on Ivy Benton. The order overruling the motion for new trial, and notice of appeal regularly entered to the Court of Criminal Appeals on July 10, 1901, were also introduced. On July 10th, Tony McDonald was sentenced in accordance with the verdict of the jury to ten years in the penitentiary, which sentence was also introduced; as well as the indictment in cause No. 710, charging Tony McDonald with rape upon Ivy Benton, a female under the age of fifteen years, not then and there being his wife, etc. The State also proved by two witnesses that they heard Tony McDonald testify upon his trial that he had had carnal intercourse with Ivy Benton several times in Baylor County.

The State also proved by Sheriff Board that Tony McDonald broke jail, pending his appeal, and had not been recaptured.

George Caylor, defendant, testified in his own behalf: "I have known Mattie Benton and her family since November, 1900. I had a good many business transactions with her and have always been friendly with her. I have been a friend to her in many ways, and have always done all I could to help her and her family. She is poor, and I wanted to help her along. I sold her an organ and a machine on a credit, and took her notes for payment. Prior to this trouble, about a week before the last term of court, Mrs. Benton sent for me and told me that Tony McDonald had ruined her daughter, and asked me if it would not be best to send her to her uncle's in Fannin County, as she was in a family way. And I told her that I thought it would. She wanted to borrow some money to send Ivy away, and I loaned her $20. I did not know that Ivy was going to Roswell, New Mexico; but thought she was going to her uncle's in Fannin County. The morning Ivy left, I sent a buggy around for her to go to the depot, because I felt sorry for her. I went to Wichita Falls on the same train that she did, and when Mr. Board brought her back I was at Wichita Falls, and came back as she did. The first I knew of Ivy going to New Mexico was when I saw her buy her ticket to that place at Wichita Falls. When I came back to Seymour, the night after Ivy left for Roswell, I struck Suttlemyer, and he asked me where Ivy and Manning were; and I told him that they had gone to New Mexico, and that if he would telegraph the sheriff at Roswell he could catch them. Mrs. Benton sent for me some time during court and asked me to send Suttlemyer up, as she wanted to tell him about Ivy being gone, so that she could get Ivy back and prosecute the man who had ruined her. I sent Suttlemyer up that day to her house. Just

after court Mrs. Benton sent for me and told me that Mr. Coombes (the district attorney), and Mr. Wheat (the county attorney), wanted her to leave town and that she was going to Paris, and wanted to buy my hack and team. I sold her my hack and one horse for $105, and took her note for $125, and a chattel mortgage on the hack and horse. The $125 note included the $105 for the hack and horse and the $20 I loaned her when Ivy went to Roswell. She gave me a power of attorney to sell and dispose of her property, which I took and disposed of. She left at night, and Harry Steed, Roscoe Rayburn and myself overtook her near Judge Newton's place and told her good-bye. Roscoe Rayburn wanted to go east, and so went off with her, and Harry Steed and I came back to town. When I found that she was going to leave, I took my lawyer, Kenan, up to Mrs. Benton's place, and she told Kenan all the facts, and Kenan went back to his office and drew an affidavit, which was introduced in evidence, and we went back to Mrs. Benton's and she signed and swore to same. I took this affidavit as a deposition, because Mrs. Benton was going away, and I was afraid she would not come back, and I wanted her testimony to use in my behalf in the trial of this case." On cross-examination he stated he had been indicted three times for felonies; that he beat the first case, and the last two are still pending.

George Blythe, for defendant, testified that he was deputy sheriff and married the half-sister of Jim Benton, Mattie Benton's husband. About a week after Ivy Benton went to Roswell witness went up to Mattie Benton's house and asked her where Ivy was, and Mrs. Benton said that Ivy had gone to her uncle's in Fannin County. Deputy Sheriff Suttle-myer testified that the night after Ivy Benton left for Roswell he saw defendant, and as he had just returned from Wichita Falls, asked him where Ivy Benton and Manning had gone, and he said to Roswell, New Mexico, and that witness could telegraph and catch them. Witness wrote a letter to Roswell and had them put in jail.

D. L. Kenan testified for defendant that just after the last term of district court defendant came to my office and wanted me to go to Mrs. Benton's with him. I went, and Mrs. Benton told me she wanted to give defendant a power of attorney. She also said she wanted to make an affidavit and told me what she wanted in it. I went back to the office and drew the power of attorney and affidavit just as she directed, and defendant and I went back to Mrs. Benton's and I read the power of attorney and affidavit over to her and she signed and swore to the affidavit, and signed and acknowledged the power of attorney in my presence before me as a notary public.

In rebuttal for the State, J. A. Wheat, county attorney, testified: "Just after the last term of district court defendant came to me and asked me what I thought about his taking Mrs. Benton's affidavit, and I told him that I could not advise him, as I was county attorney; and that he would have to see his own lawyers; but that I thought he had better leave her alone. Defendant then said he wanted the affidavit to

break down her testimony with, and that he thought it would be a good defense. I told him that he would have to look after his own defense."

In rebuttal defendant Caylor testified that the reason he went to Wheat was because he was representing the State, and defendant had put in a call over the 'phone for Coombes, the district attorney, and could not get him. Defendant desired the affidavit as a deposition, because Mrs. Benton was going away, and he was afraid she would not return, and he wanted the State to have notice of it. Glasgow testified that he put in a call over the long distance 'phone for Mr. Coombes at the request of defendant, but could not get him.

Appellant insists that the evidence is not sufficient to support the conviction, in that the same does not show that appellant is an accessory after the fact to the rape committed by Tony McDonald. We think the evidence above detailed bears out appellant's contention. The Assistant Attorney-General insists that the evidence supports the conviction, and cites Blakeley v. State, 24 Texas Crim. App., 617. A casual inspection of this case might indicate that he was correct, but a closer scrutiny shows that it does not support this prosecution. That case was predicated upon the idea that appellant rendered some direct aid to his principal to escape arrest and prosecution. The subsequent subornation of perjury committed by Blakeley merely served to intensify the evidence going to show that Blakeley advised his principal to flee. In order to constitute one an accessory after the fact, there must be some aid rendered to the principal direct. The evidence before us does not show such a state of facts. We therefore hold that the judgment is not supported by the evidence.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

HENDERSON, Judge.—In my view, the facts of this case bring it clearly within the rule laid down in Blakeley v. State, 24 Texas Crim. App., 617. That was a case in which the aid rendered by the accessory was in procuring witnesses to commit perjury, in order that appellant might not be indicted. In this case the aid rendered by the accessory, according to the State's theory, was to spirit away prosecuting witness, so that she might not be had before the grand jury in order to testify against defendant for the purpose of procuring an indictment against him. However, the Blakeley case carries the doctrine of accessory further than any case that I know, and in my opinion is not supported by the authorities and should be overruled, which, I believe, is the effect of the decision in this case.