## J. H. HARRISON V. STATE.

### No. 2063.    Decided November 27, 1912.

Rehearing denied February 5, 1913.

**1.—Accessory after Fact—Indictment.**

Where, upon trial of accessory after the fact to the crime of seduction, the indictment followed approved precedent, the same was sufficient. Following Gann v. State, 42 Texas Crim. Rep., 133.

**2.—Same—Sufficiency of the Evidence.**

Where, upon trial of accessory after the fact to the crime of seduction, the evidence sustained the conviction and the court properly charged the law of the case, there was no error.

**3.—Same—Bills of Exception—Practice on Appeal.**

Where, upon appeal, the bills of exception did not set out the proceedings in the court below sufficiently to enable this court to know whether an error had been committed in the admission of certain testimony, the same cannot be considered.

**4.—Same—Evidence—Principal—Accessory.**

Where the testimony introduced, upon trial of an accessory after the fact to the crime of seduction, was admissible against the principal, the same was admissible against the accessory; however, the details of the operations to produce an abortion and the suffering it entailed would not have been admissible if the same had been properly excepted to. Following Tubb v. State, 55 Texas Crim. Rep., 606, and other cases.

**5.—Same—Evidence—Defendant as a Witness—Grand Jury.**

Where, upon trial of accessory after the fact to the crime of seduction, the State introduced defendant's testimony before the grand jury, and it appeared from the record that at that time he was not under arrest or charged with a crime in any manner, but voluntarily gave his testimony without claiming self-incrimination, there was no error; besides, the bill of exceptions was defective.

**6.—Same—Evidence—Conspirators.**

Where, upon trial of accessory after the fact to the crime of seduction, it was shown that defendant and others acted together in spiriting away a witness for the State by paying him money to leave the county of the prosecution, there was no error in admiting testimony as to the effort which the co-conspirator made to secure said money, the defendant's connection therewith being substantially shown; besides, the bill of exceptions was defective.

**7.—Same—Charge of Court—Recalling Jury—Statutes Construed.**

While the earlier decisions held that under article 754, Code Criminal Procedure, the judge was inhibited from further instructing the jury after their retirement, etc., it is now uniformly held that the judge may recall the jury and give them further instructions whenever he considers it necessary, and where he briefly and succintly told the jury what to do in answer to their question propounded, there was no error. Following Benavedias v. State, 31 Texas Crim. Rep., 173.

**8.—Same—Charge of Court—Accessory—Principal.**

Where, upon trial of accessory after the fact to the crime of seduction, the court properly charged the jury and distinctly required that if they had a reasonable doubt as to the guilt of the principal, to acquit defendant, there was no error.

**9.—Same—Fugitive From Justice—Severance—Practice on Appeal.**

Where it appeared that the principal, in a prosecution of the accessory, was a fugitive from justice, but it appeared from the record that defendant made no motion to require the State to first try the principal and did not show that the principal had been arrested or could be tried, a complaint in a motion for new trial on this ground came too late.

**10.—Same—Definition of an Accessory after the Fact—Spiriting Away Witnesses.**

Where, upon trial of an accessory after the fact to the crime of seduction, it appeared from the record on appeal that the defendant in order to prevent his principal from being indicted, arrested and tried, spirited away or hired the material State's witnesses to leave the county so that they could not be had before the grand jury or the trial of said principal before the court, held that this is such aid personally and directly to the offender as would make the defendant an accessory after the fact, under Article 86, Penal Code. Following Blakely v. State, 24 Texas Crim. App. 616. Qualifying Caylor v. State, 44 Texas Crim. Rep., 118, and other cases.

**11.—Same—Definition of Accessory—Cases Qualified—Disapproved.**

See opinion for construction of Article 86, Penal Code, qualifying and partly disapproving the following cases: Shaekey v. State, 41 Texas Crim. Rep., 255; Chenault v. State, 46 Texas Crim. Rep., 351; Hargrove v. State, 63 Texas Crim. Rep., 143; Chitister v. State, 33 Texas Crim. Rep., 635; Gann v. State, 42 Texas Crim. Rep., 133; Miller v. State, 72 S. W. Rep., 996; Dent v. State, 43 Texas Crim. Rep., 126.

Appeal from the District Court of Comanche.   Tried below before the Hon. J. H. Arnold.

Appeal from a conviction of accessory after the fact; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Smith & Palmer,* for appellants.—On question of the court's charge on seduction: Nash v. State, 61 Texas Crim. Rep., 259, 134 S. W. Rep., 709.

On question of definition of accessory after the fact: Caylor v. State, 44 Tex. Crim. Rep., 118, and cases stated in opinion.

On question of escape of principal: Williams v. State, 27 Texas Crim. App., 466; West v. State, 27 id., 472.

On question of defendant as a witness before the grand jury: Gutgesell v. State, 43 S. W. Rep., 1016.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—The appellant was indicted as an accessory to the crime of seduction. The indictment properly charged that Sam Wimberly on October 15, 1910, seduced Mattie Waldrip. Then the indictment properly charged appellant as an accessory in that, knowing that said Wimberly had committed said offense of seduction, with the purpose and in order that said Wimberly might evade a trial for said offense so committed by him, did unlawfully and willfully conceal and give aid to him. The jury convicted him and fixed his penalty at the lowest,—two years in the penitentiary.

The indictment follows as literally as it can, the form prescribed by Judge White, in his Annotated Penal Code, sec. 108, and is sufficient, expressly so held by repeated decisions of this court. Gann v. State, 42 Texas Crim. Rep., 133.

It is unnecessary to detail the evidence. The appellant neither testified nor offered any evidence. The testimony was amply sufficient to justify the jury to believe and find that said Wimberly was guilty of the crime of seducing said Mattie Waldrip, as charged in the indictment, which question was properly submitted by the court to the jury requiring such finding by them before they could convict appellant.

The testimony was amply sufficient to justify the jury to believe and find that, after said Wimberly had committed said crime of seduction by illicit intercourse with Mattie Waldrip, he got her in family way, and that a short time before the grand jury convened at which this investigation was made and indictment found, he procured an abortion to be had upon her; that about a month after the abortion the grand jury convened and began investigating all this matter and, among others, had had as a witness Mattie Waldrip's brother Tom before it with whom she then lived and for several months prior thereto had lived, together with another sister; that she had also just been summoned by the grand jury to appear before it as a witness in the same matter. Her father, T. G. Waldrip, was also a material witness in the matter and if he had not already been, doubtless would have been summoned before the grand jury as a witness in said investigation as the evidence justified the jury to believe appellant knew and anticipated. Mattie Waldrip and her sister, Myrtle Waldrip, and brother Tom lived some ten or twelve miles distant from where her father, T. G. Waldrip, lived. They all lived some considerable distance from the town of Comanche, county seat of Comanche County, where the grand jury was in session. Tom was before the grand jury on Wednesday, as a witness in said investigation. On Thursday his father went by for him and they together went to the little town of Gustine to purchase some supplies. It seems that this town was the trading point of said Waldrips and somewhere not far from the location of appellant, said Wimberly and others connected with this matter; that along about the middle of the evening after said Waldrip had made his purchases and was at or in his buggy waiting for

his son Tom to leave Gustine and return to their homes, he was approached by appellant who introduced himself to said Waldrip. Appellant proceeded to engage Waldrip for a while in general conversation then brought up to him the trouble he and his said daughter Mattie were having, and, after thus bringing up the subject, he invited and had Waldrip to get in a hack with him where they could sit down and discuss the matter. He then proceeded to tell him that he, appellant, knew of other girls who had gotten into the same kind of trouble and had left the community where it occurred, gone a considerable distance, redeemed themselves, restored their reputation and married well and were doing well. He then proceeded to ask said Waldrip how much it would take to move him and his daughters out of the community, telling him that his (Waldrip's and his daughters') friends had made up some money for him if he wanted to use it and asked him how much it would take to move him. Said Waldrip replied that if it was a free donation made by his friends he would take whatever was made up for him if it was sufficient for him to leave on. Appellant then told him to stay where he was till another fellow came to see him, Waldrip, and he asked him if he knew Sol Ingram. Waldrip replied that he had met him a few times but did not know that he was personally acquainted with him. Directly Ingram came to him, Waldrip, where he then was, and Waldrip thinks appellant came with Ingram to him, but whether he did or not, just a little later he did so. Then they all three, appellant, Ingram and Waldrip, talked the matter over and Ingram told him in the presence of appellant that appellant had told him about the $200 and how it had been made up by his, Waldrip's and his daughters' friends. They did not tell him who had made it up, or who were their friends, but asked him if he was paid this money if he "could go and go right now." Waldrip replied that it would take him a little while to wind up his business. Ingram kept on talking and finally asked him if he "could not go right now if they would give me (him) that much and I told him I reckoned so, and Mr. Harrison (appellant) was there then I know." Ingram then asked appellant if he, appellant, could go and drive one of the conveyances to take said Waldrip and his daughters away. After some parleying appellant agreed to do so. There was then some discussion between the three as to where he was to go to take the train. Waldrip told them that Comanche would be the nearest point and they gave him to understand they didn't want him to go to Comanche to take the train. They then agreed that Mullen, another railroad station in another county, was the next nearest place. The understanding between the three was that Waldrip was to leave Comanche County that night, taking his children with him. This conference and agreement occurred about three hours before sundown. Ingram and appellant then told Waldrip to go by, get his children, take them over to his camp and that they would come on that night to his camp and take him and his children

from his camp to Mullen. All this agreement was carried out by these persons that night. Waldrip, with his son Tom, did at once go to Tom's place, hastily have his two daughters to pack what clothes and household goods they were to take, leaving for his camp about 8 o'clock at night, his daughter Myrtle in the buggy with him and his daughter Mattie in the buggy with her brother Tom, going then some ten or twelve miles at night to his camp; that he then, after reaching his camp with his children, hastily prepared what clothing and household goods he could take in trunks and about midnight or a little later Ingram and appellant appeared at his camp, one with a buggy and the other with a hack. One of the teams was that of Wimberly. Said Ingram and Waldrip, after placing the trunks of Waldrip and his daughters in their conveyances, proceeded, after midnight, with them to the said town of Mullen, traveling all that night, reaching Mullen the next day. Appellant drove one of the conveyances part of the time that night with said Waldrip and his wife therein, and Ingram the other with the two daughters of Waldrip, Mattie and Myrtle. During the night these persons exchanged, appellant driving the buggy with the two daughters in it part of the way and Ingram the conveyances with Waldrip and his wife therein part of the way. Upon reaching Mullen they took the trunks of the parties to the depot of the railroad and the women folk to the hotel. They went to the wagon yard. After reaching Mullen and before Ingram and appellant left Mullen, returning to their homes they paid Waldrip $165 of the $200 cash they were to pay him, gave each of Waldrip's two daughters some of the money, took out $10 to pay Harrison for his time and efforts in going and driving one of the conveyances, and agreed to pay Waldrip's son for him, later, the balance of the $200 cash. It was further shown that after the conference and agreement between said Waldrip, appellant and Ingram, it was after banking hours and the banks in the town had closed, that Ingram went to one of the bankers and to some of the merchants in an attempt to raise the $200 cash, telling them that he was compelled to have $200 cash that evening. By manipulating around with two or three of them he arranged between them to raise and did raise and got $200 cash that evening. The evidence further shows that appellant and Ingram after getting said two conveyances went at night to said Waldrip's camp, arriving there, as stated above, about or after midnight; that said Wimberly was with them when they started to this camp for Waldrip and his daughters and that said Wimberly drove the hack from Gustine to Fleming a part of the way and appellant and said Ingram rode in the buggy that far together. It further shows that as agreed between them Waldrip did not tell them when they separated the next day in Mullen where he was going and take his family. They didn't know and wanted not to know. That was a part of the plan arranged between them.

Appellant has several bills of exceptions to the admission of certain

testimony. Not one of these bills is prepared in accordance with the well established and uniformly enforced rules of this court. None of them set out the proceedings in the court below sufficiently to enable this court to know whether or not an error has been committed. Neither of them of and within themselves disclose all that is necessary to manifest the supposed error, and none of them, as stated above, comply with the rules of this court sufficiently to authorize or require it to consider them. These rules have been so frequently announced and the cases cited establishing them that we deem it unnecessary to again do so, but see sec. 857, p. 557; sec. 1123, p. 732, of White's Ann. C. C. P. Yet, while these bills are in this condition, we will state some of them and the questions attempted to be raised thereby.

The substance of the first bill in full is this: After the style, number of the cause and the court, it states that upon the trial the witness Mattie Waldrip, being on the stand testifying as a witness for the State, and having testified to having intercourse with said Wimberly and having missed her monthly sickness, was permitted, over his objections, to further testify: "After that Sam Wimberly saw me and asked me if I had missed and I told him that I had and he told me that he would get me some medicine. He got the medicine and told me how to take it and told me what it was intended to do. He told me the medicine was to bring my periods back. He told me how to take the medicine. I then took the medicine as he directed. It did not bring my periods back. Later on after that Sam saw me again and had a talk with me in reference as to whether my periods had come back on me. He asked me if my sickness had returned and I told him no. On the second trip he told me that if the medicine did not bring them on that he would get a doctor. He told me that he would get Dr. Daniels. He then brought me some medicine the second time but did not tell me who it was that fixed the medicine up. He told me how to take the second lot of medicine that he brought me. I took that medicine like he told me. He told me that it was to bring my periods around. Before he brought the second medicine he had seen me and asked me if the first medicine he gave me brought me around all right. I told him it had not." That when this testimony was offered he objected to it (a) because it related to acts, matters and conversations had between the witness and a third person in his absence, there being no proof that he knew that said Wimberly had had intercourse with said witness, or that said Wimberly had obtained such intercourse by a promise of marriage, or that he agreed to any of those things and that he could not be bound and was not responsible for any act, word or thing so done or testified to; (b) because said testimony was highly prejudicial and inflammatory and calculated to injure him before the jury and would show, if believed by the jury, that said Wimberly had seduced said witness and was then trying and attempting to produce an abortion and a miscarriage upon her, was irrelevant and immaterial. The court, in allow-

ing the bill, did so with the explanation that appellant was being tried for the offense of an accessory to the crime of seduction which was alleged to have been committed upon the witness by said Wimberly; that the charge of the court required the jury to believe beyond a reasonable doubt that said Wimberly committed the crime of seduction on her as alleged in the indictment before appellant could be convicted on the charge against him,—the above portion of the evidence against Wimberly going to show that he had intercourse with said witness and tending, at least in part, to show he was guilty of the crime; that if said Wimberly had been on trial for seduction this evidence would have been admissible against him and being so, was competent as going to show guilt in the trial of one whose connection with that crime was that of an accessory.

The next bill makes only the same general statement of the said witness, Mattie Waldrip, being on the stand for the State and testifying, quoting nearly two typewritten pages of her testimony along the same line and to the effect that said Wimberly shortly before an abortion was produced upon her by the doctor whom Wimberly had procured and sent to her for that purpose, had ascertained from her her condition of pregnancy by him, his, Wimberly's furnishing her with medicine to bring on her monthly period and produce an abortion, failing in that that he had procured and sent to her through said Ingram a doctor who had performed an operation upon her and produced a miscarriage and abortion. To all of this testimony he made substantially the same objections as to that first above stated. In approving that bill the judge did so with the explanation and qualification that it was the State's theory that said Ingram, Wimberly and said doctor, whose name was Daniels, had all acted together as principals in producing an abortion on said witness to suppress and destroy the foetus of the child begotten by Wimberly's intercourse with her in pursuance of his seduction of her, and that this abortion was to protect him from arrest and conviction for his said crime and that such conduct on his part and all those with whom he acted as a principal tended, at least, to connect him with the seduction of said girl and tended to show he had intercourse with her and that there was evidence to support this theory. That this evidence would have been admissible against Wimberly if he had been on trial for seduction and was also admissible against one who subsequently became connected as an accessory with him in said crime.

Even if we could properly consider these bills, there is no question but that some, if not all, of this testimony would have been admissible against Wimberly if he had been on trial for seduction. As was properly held by the trial court, it was necessary under the law for the State to introduce evidence to prove that said Wimberly was guilty of seduction as charged and any legitimate evidence tending to show or establish that charge was admissible against him. Being admissible against him, it was admissible against appellant as he

was charged as an accessory to that crime, whether appellant was present when any of the acts and dealings which occurred between the said seduced girl and Wimberly or not. We think, under all of the authorities, some, if not all of this testimony, would have been admissible against Wimberly if he had been then on trial for said charged crime of seduction.

It is our opinion, however, that even if said Wimberly had thus been on trial that the details of the operation to produce the abortion and the details of her suffering then and afterwards, would not have been admissible if any such testimony by itself had been singled out and properly objected to and the proper bills saved at the time. But that was not done in this case and bills show no such thing, but they show, as stated above, that the objections were general and to the whole of the testimony without singling out and objecting properly to that part which was inadmissible. The rule in this State is well established that under such circumstances the bill, being as stated, no reversible error is shown. Tubb v. State, 55 Tex. Crim. Rep., 606 (Peyton v. State, 35 Tex. Crim. Rep., 510) ; Cabral v. State, 57 Tex. Crim. Rep., 304, 122 S. W. Rep., 872; 1 Thomp. on Tri., sec. 696.

By another bill, headed the same as the ones above noted, it is stated that while the State's witness, Mr. Clark was on the stand he testified in substance that he was a member and secretary of the grand jury at the time they were investigating the matters in connection with said girl, Mattie Waldrip; that appellant was subpoenaed to come before it, did so in obedience to the subpoena and testified therein; that his testimony was taken down in writing by the witness at the time, read over to appellant and signed by him; that this written testimony of he appellant was then introduced in evidence and it is quoted in the bill and that it was introduced as original evidence, while the State was introducing its testimony before it rested; that appellant objected to it on the following grounds: (a) Because it was competent and permissible for the State to show the statement made by the defendant before the jury. (This ground has evidently been miscopied in the record. Doubtless the objection was that the evidence was incompetent and not permissible) ; (b) it was not then an issue before the court and not made so by the defense as to the truth of the matters inquired about by the State in the introduction of said written testimony; (c) that the grand jury had no right, under the law, to so subpoena appellant and require him to come before it and require him to testify in regard to the matter in question when they were investigating an accusation against him, and that it did not appear that said statement so made by him was voluntary, and that it did not appear before making it he was warned by the grand jury that any statement he might make would be used as evidence against him and not for him; (d) that appellant not being a witness now in this trial, it was contrary to the law for the State to be permitted to show in evidence statements and declarations so

made before the grand jury as a part of its original evidence; (e) that it was not competent for the grand jury to make public the proceedings of that body and make public the testimony given before it by the accused. It will be noted that these various matters stated as objections were stated only and solely as objections and not as facts and were not approved by the court as facts. In allowing the bill, the court qualified and explained it by stating that appellant was not under arrest and before the grand jury and had not therefore been indicted or otherwise charged with the crime in question, or, so far as any evidence showed had not even been suspicioned of being connected therewith; that he voluntarily gave the evidence before the grand jury as any other witness and at no time and in no way claimed the privilege and asked to be excused from testifying on account of self-incrimination. In our opinion the statement, testimony and admission of a party who is on trial under such circumstances is admissible against him, there can be no question. Under the circumstances stated by the qualification of the court, and the clear lack of showing otherwise by the bill as a statement of facts in connection with the testimony of said witness Clark and the sworn testimony of the appellant, the court was clearly correct in admitting this testimony even if, as presented, we could consider this bill and the question attempted to be raised.

By three other bills appellant attempts to object to the testimony of the bankers at Gustine showing that said Ingram, late in the evening after he and Harrison had had said interview and trade with the witness Waldrip, as shown above, the efforts and statements he made to raise the $200 which they were to pay Waldrip, and the fact that he did raise and procure at the time from different persons $200.

Various objections are made to this testimony but principally because appellant is not shown to have been present and his connection therewith is not shown, etc. The court, in allowing these bills, explained and qualified them by showing that said Ingram, Wimberly and appellant were shown at least substantially, if not by positive testimony, to have acted together in the matter of paying the $200 obtained by Ingram at said time to pay said Waldrip, who was a witness against Wimberly in the seduction charge and to secure his flight from the country and induce him to take with him his said daughter Mattie; that appellant's connection with the money transaction was substantially shown and as it would be admissible against Wimberly was also competent against appellant. And further, that appellant's testimony before the grand jury showed that he, Ingram and Wimberly acted together in the matter of paying the money secured to Waldrip to secure his and his daughter's flight from the country. Appellant actually assisted in carrying them away. He also states as a fact that both Ingram and Wimberly fled the country after the above facts transpired and had not up to the time of this trial been arrested on the indictments against them for their con-

nection with the crimes of seduction, abortion, bribery, etc., against them.

Whether all of the details of the testimony of these respective witnesses should have been admitted or not, we are not called upon to say. Clearly, in our opinion, the main features of their testimony to the effect that he applied to them to procure this $200 and did procure it from them was admissible. Neither of these bills, even if considered, show any reversible error.

By another bill which is quite lengthy, as qualified and shown by it and the court, it appears that the jury after being charged and considering the case for some time, returned into open court in a body. The appellant was present, though his attorneys seem not to have been. The jury propounded to the court in writing this question: "Was it absolutely necessary for Henry Harrison (the defendant) to know that Mattie Waldrip was seduced by Wimberly?" The court in answer thereto at that time gave them this written charge: "In answer to the question propounded to me in open court in the following language, 'Was it absolutely necessary for Henry Harrison (the defendant), to know that Mattie Waldrip was seduced by Sam Wimberly?' I refer you to my main charge for a full statement of the law on that subject in connection with the law on other branches of the case. In order for the defendant to be guilty of being an accessory he must have known that the crime of seduction of Mattie Waldrip had been committed by Sam Wimberly. This issue is one for the determination of the jury and in passing upon and determining said question, you are entitled to consider all the facts and circumstances in evidence before you and it is for you to say from all such facts and circumstances in evidence before you whether he had such knowledge." The bill is too lengthy to copy in full and it is unnecessary to further state the matter therefrom.

Article 754, Code Criminal Procedure, is as follows: "The jury, after having retired, may ask further instruction of the judge touching any matter of law. For this purpose, the jury shall appear before the judge, in open court, in a body, and through their foreman shall state to the court, either verbally or in writing, the particular point of law upon which they desire further instruction; and the court shall give such instruction in writing, but no instruction shall be given, except upon the particular point on which it is asked." Some of the earlier decisions of this, and our Supreme Court when it had criminal jurisdiction, held that under the statute as it then and aforetime was that the judge was inhibited from in any event further charging the jury after he had delivered to them, and they had retired with his main charge. This rule, however, was changed on the adoption of the Revised Statutes of 1879, and this court has uniformly held that the judge may now, of his own motion, recall the jury and give them further instructions whenever he considers it necessary to do so, of course; the defendant being present. (Benavides v. State,

31 Texas Crim. Rep., 173, and authorities therein cited.) In addition to this the statute above quoted makes it his duty to instruct the jury on the particular question they ask and while the statute says that no instruction shall be given, except upon the particular point upon which it is asked, it does not mean and has not been construed by this court to mean, that because thereof the court can not at that or any other time before the verdict correctly charge the jury on any matter thought necessary or proper by him. Neither does this statute mean that the court must give the shortest possible answer to such a question as he might have done in this case by the one word "no" or the one word "yes," but it would be proper, as was done in this case to briefly and succinctly tell the jury, correctly what to do in consideration of the question propounded by the jury and answered by the court. We think the court did not commit any reversible error in giving the special charge above quoted under the circumstances as shown in this case and as explained by him in allowing the bill.

In appellant's motion for new trial some isolated paragraphs of the court's charge are objected to and criticized. Appellant asked no special charge in the case. We have considered these matters. The court in the charge as a whole, fairly and fully submitted the questions at issue to the jury for their proper finding and, taken as a whole, appellant's objections to said paragraphs do not present any material error. The court, after submitting the question to the jury and requiring them to affirmatively believe all the facts necessary beyond a reasonable doubt before they could convict, gave a separate and distinct charge to the effect that if they had a reasonable doubt as to whether said Wimberly was guilty of the crime of seduction, as alleged in the indictment, within the meaning of the law on that subject, as given them above in the charge, or if they should have a reasonable doubt that the defendant, knowing that said Wimberly had committed said crime, concealed him or gave him any other aid in order that he might evade a trial for said offense, to acquit appellant.

The judge in explaining and qualifying one of appellant's bills, states that it is a fact that said Wimberly is a fugitive from justice and has not been arrested under the indictments found and pending against him for seduction, etc. Appellant made no motion to require the State to first try said Wimberly and in no way set up that Wimberly had been arrested or could be tried. In the absence of any motion or bill of exceptions calling upon the court to try Wimberly before appellant and in the absence of any showing that said Wimberly had been arrested, or could be tried, it comes too late in the motion for new trial to complain that Wimberly was not first tried and that appellant should not have been tried until Wimberly was tried.

The evidence was sufficient, in our opinion, to justify the verdict of the jury.

The judgment will be affirmed.                                    *Affirmed.*

PRENDERGAST, JUDGE.—Appellant presents but one question in his motion for rehearing. He contends that under certain decisions of this court and others, cited by him in his brief, that the evidence does not show or justify the jury to have found that he was an accessory under our law. His contention is tersely and accurately stated as follows:

"Appellant's contention is that he could not be guilty in this case on the facts as an accessory to the crime of seduction as charged against him, because the character of aid rendered by him as disclosed by the facts was not that direct and personal aid rendered the principal, Sam Wimberly, contemplated by our statute and as construed by the decisions of this court and of the courts of other states with similar statutes.

He cites and relies upon Caylor v. State, 44 Texas Crim. Rep., 118; Shackey v. State, 41 Texas Crim. Rep., 255; Chenault v. State, 46, Texas Crim. Rep., 351; Hargrove v. State, 63 Texas Crim. Rep., 143; Chitister v. State, 33 Texas Crim. Rep., 635; Gann v. State, 42 Texas Crim. Rep., 133; Miller v. State, 72 S. W. Rep., 996; Dent v. State, 43 Texas Crim. Rep., 126, and some New York and Georgia cases cited in A. & E. Ency. of Law, notes 2 and 3, page 267, and 12 Cyc., p. 192, sec. 3, and cases therein cited.

If this court was bound by some of the general statements in some or all of these opinions of the character of aid that it takes to constitute one an accessory after the fact, they would be in point and strongly support appellant's contention. But when each case is carefully considered, it will be noticed that the general statement of what it takes to constitute an accessory is not in point, for all such general statements and quotations of the common law text-books of what it takes to constitute an accessory, were uncalled for, and in most, if not all, instances *obiter dictum*. Take as an illustration the case of Caylor v. State, supra. The court held specifically in that case that the evidence was insufficient to sustain the conviction, and that was what was held and upon which the case was reversed. Again, take as an illustration the case of Hargrove v. State, supra. A careful examination of the case will show that what the court held in that case was "that the fact that he (the witness Williams) denied to Mr. Elkins (the county attorney) soon after the killing any knowledge of the matter and stated that appellant was at home (if appellant is guilty), is not such conduct as would render him an accessory," citing and quoting from several of the cases, supra, cited and relied upon by appellant. It is true that the opinion of Judge Harper in the Hargrove case proceeds to quote from other cases the said same general statements of what character of aid rendered to the principal was necessary to constitute one an accessory.

Our statute defining an accessory after the fact is as follows:

"An accessory is one who, knowing that an offense has been committed, conceals the offender or gives him any other aid, in order that he may evade an arrest, or trial, or the execution of his sentence." P. C., Art. 86.

The case of Blakely v. State, 24 Texas Crim. App., 616, correctly construes our statute above, quoting it. The opinion in that case was prepared by Presiding Judge White when he and Judges Hurt and Willson constituted this court. The opinion shows that the question was carefully considered and the decision deliberately announced. That case has never been overruled by this court. It seems that no judge, from that day to this, who has ever been upon this court entertained the opinion that said decision is incorrect, unless it be Judge Henderson as indicated by him in his dissenting opinion in the Caylor case, supra. This question was thoroughly considered and discussed by this court in consultation when the Hargrove case, supra, was decided. The opinion in that case as prepared by Judge Harper at first stated that the Blakely case on this point had been overruled, but in consultation, all the judges being present and concurring, it was the opinion of the court that said Blakely case had not been overruled, but that it announced the correct doctrine and correctly construed our statute on this question; and that portion of Judge Harper's opinion as first prepared indicating otherwise was deliberately stricken out before handing it down. In order to show what was specifically decided by this court in the Blakely case, supra, we here liberally quote therefrom:

"In brief the facts proven were that, immediately after the homicide, this defendant and May went off to themselves and had a private conversation, after which May mounted a horse and rode off. Defendant Blakely then told the only other two parties who were present that they must swear before the coroner's jury to a certain state of facts which he then and there detailed, and that if they did so it would appear to said jury, and they would so find, that May was justifiable in self-defense in killing Daffin, and he would either be exonerated entirely or put upon a very light bond to answer the charge. Acting upon these suggestions, and through fear of May and defendant, the two witnesses did, at the coroner's inquest, swear, as did also Blakely, to the fabricated statement of the occurrence as devised by Blakely, and the result, as anticipated by Blakely, was that May was subsequently placed under a nominal bond, and that the grand jury for several terms of the District Court thereafter failed to indict him for the murder, and he was only indicted after it leaked out and was ascertained that the testimony given by the witnesses at the inquest was false and perjured. On May's trial under indictment for the murder, the two witnesses who had sworn on the inquest to the fabricated statement of Blakely, testified that they had sworn falsely, and developed the reasons and inducements causing them to do so. They

also stated, as they declared truthfully, the facts attendant upon the homicide as they actually did occur, and upon this testimony, corroborated as it was by other evidence, May was convicted of murder of the first degree, and his punishment was affixed by the verdict and judgment of the court of a term of seventy-five years in the penitentiary; which judgment on appeal was afterwards affirmed by this court. (May v. State, 23 Texas Crim. App., 146.)

"It is perhaps necessary that we should further state that, after the conversation between May and defendant immediately following upon the killing, and after he had mounted a horse and ridden off as above stated, May did not appear at the coroner's inquest, nor was he seen for a day or so thereafter, until his appearance before the justice of the peace to enter into nominal bond for his appearance above mentioned.

"On this appellant Blakely's trial as accessory, the two witnesses also testified as in May's case to the facts with regard to the fabricated testimony at the inquest, and to the facts as they really occurred.

"The objections presented to this testimony are thus stated in the able brief of counsel for appellant, viz.:

" 'We submit that under our statute the "aid" given to an offender which the law denounces, is something which relates to the personal conduct of the offender after the offense, or an aid which obstructs the operation of the law in its executive branch, such as concealing the person of the offender, or advising him how to escape pursuit; furnishing him means to make his flight; putting persons in·pursuit off the track, and not an aid which causes justice to slumber, or perverts its course, such as compounding with a felon, concealing the transaction either by silence or by perverting the facts so as to make that appear innocent which in truth is not.'

"Mr. Bishop says 'the true test whether one is an accessory after the fact is whether what he did was by way of personal help to his principal to elude punishment, the kind of help being unimportant.' (1 Bish. Crim. Law, 7 ed., sec. 695.) Mr. Wharton says: 'Any assistance given to one known to be a felon, in order to hinder his apprehension, trial and punishment, is sufficient, it is held, to make a man an accessory after the fact.' (1 Whart. Crim. Law, 8 ed., sec. 241.)

"We are of opinion the facts we have stated, and upon which this case rests, bring it within the purview of the general law and our statute, supra, as to accessories. Appellant, if he did not in fact conceal May until the perjured testimony was given which justified him before the inquest, certainly aided him to the extent that he was not arrested and punished for his crime until the perjury was discovered, and but for the discovery the aid which defendant attempted to give him would have proven effectual in affording him perfect and complete immunity from apprehension, trial and punishment for the murder he had committed.

"It is true that, under the facts disclosed, defendant might have been prosecuted and convicted under our statute for subornation of perjury (Penal Code, art. 199), but this fact did not destroy nor affect his relation to the murder as an accessory; it was simply a question with the prosecution as to which of the offenses he should be tried for. We have discussed this branch of the case thus lengthily because of the fact that our statute as to accessories has never before been directly construed."

It will be noted that the court stated "we have discussed this branch of the case thus lengthily because of the fact that our statute as to accessories has never before been directly construed."

Now in the light of our statute quoted above and of the first decision of this court construing it on this point, let us see what character of aid appellant rendered to his principal, Wimberly, in this case. We do not propose to go into any lengthy statement of the evidence. It was sufficiently stated in the original opinion. We will merely briefly restate the salient point.

The evidence was sufficient to show that Wimberly had seduced the girl as charged in the indictment, and that appellant had full knowledge thereof as was required to be found by the charge of the court and was found by the jury in this case. It was further clearly shown that the grand jury of Comanche County, where the offense is charged to have been committed, was in session, having just been convened, organized, etc., and they were then specifically investigating, among others, the said charge of seduction against Wimberly, and that on Wednesday before this offense is alleged to have been committed on Thursday, had Tom Waldrip, the brother of the seduced girl, who was a material witness, before them; that in further investigation of the case the grand jury had had a subpoena issued and served upon the seduced girl, Mattie Waldrip, summoning her to appear before the grand jury as a witness in the same matter, and doubtless the grand jury, in further investigation of it, would have had her father, T. G. Waldrip, also before them as a material witness in the investigation. The evidence was sufficient to show that appellant and said Wimberly knew, or had notice, of all this. Tom Waldrip and his father were in the little town of Gustine, their trading point, on this Thursday evening, when appellant first approached T. G. Waldrip and proposed to hire him, not only to get away from Comanche County himself, but go at once and take his daughter, said Mattie Waldrip, with him, and that he did then hire T. G. Waldrip to carry out this plan, and paid, or had paid, nearly $200 in cash to so have them to leave, for no other purpose than to aid said Wimberly, and to keep said witnesses from appearing before the grand jury against Wimberly and to prevent an indictment, his arrest and a trial for the commission of said crime of seduction. Appellant and those then acting with him, entered into the particulars with Waldrip of how, and when he, appellant, and those associated with him,

were to spirit away these witnesses that night, and have them to go "right now." Waldrip, the father and his son Tom, were to go to where the girl Mattie Waldrip and her sister were, some several miles from Gustine, take them, in the dead hours of the night, from where they were then living, some ten or twelve miles to his camp, and then, in the dead hours of the night, he the father, and the girls were to be taken away by appellant from Comanche County and secreted where they could not be found, or run out of the State, to thereby directly aid said Wimberly in preventing his indictment, and trial, and arrest. Wimberly furnished one of the teams, if he did not also furnish one of the vehicles, which appellant and the other parties interested with him, were to take these witnesses away from Comanche County, and out of the jurisdiction of the Comanche County court. Wimberly went with them part of the way that night, driving one of the teams, when they were going after these witnesses. Wimberly was a party to the whole thing and did actually participate therein, and had appellant and the other party with him to take these witnesses away. Thereby appellant rendered him the aid contemplated by our statute. No greater, or more direct, personal aid could have been rendered to Wimberly by which he was to evade a trial and an arrest under an indictment charging him with the seduction of this girl. Spiriting the necessary and important witnesses out of the jurisdiction of the court, and out of the State, as the indications were that these witnesses were to leave the State is incomparably greater aid rendered directly and personally to the appellant than of merely furnishing a horse or vehicle or money to himself get away. Even if he could have or should have gotten out of the State if an indictment had been found against him, he could have been arrested anywhere in the United States, and perhaps other nations, extradited, and brought back to Comanche County for trial; but if appellant had spirited the witnesses out of the State there is no way known under our law whereby such witnesses could legally have been returned to the jurisdiction of the court in Comanche County, or their evidence had, to find an indictment, and Wimberly be arrested and tried.

So that we hold that under our statute anyone who, knowing that an offense has been committed, in order to prevent the offender from being indicted, and arrested or tried, spirits away or hires the material witnesses to leave so that they cannot be had before the grand jury or trial court, this is such aid personally and directly to the offender as would make such person an accessory, all the other requisites being shown.

We further hold that the construction of our accessory statute in the Blakely case is a correct construction thereof and that all of the other general statements in the decisions of this court indicating otherwise are hereby expressly disapproved.

The motion is overruled.                              *Overruled.*