[Crim. No. 5593.   In Bank.   Feb. 1, 1955.]

THE PEOPLE, Respondent, v. ANTHONY ZILBAUER, Appellant.

44

Anthony Zilbauer, in pro. per., and Thomas Higgins, Jr., under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

SHENK, J.—The defendant was charged by information in Count I with the kidnapping of Belle Brooks on November 20, 1953, with intent and for the purpose of committing robbery, and in Count II with the murder of Andrew Kmiec on November 21, 1953. The information also alleged that the defendant was armed with a deadly weapon at the time of each offense and that he had previously been convicted of the felonies of uttering and publishing forged instrument to defraud in Ohio in 1922, robbery in Ohio in 1935, auto stealing and uttering check with intent to defraud in Ohio in 1946, and with having served a term of imprisonment for each offense. On arraignment he denied the prior convictions and pleaded not guilty and not guilty by reason

of insanity. At the trial, by leave of court, he withdrew his insanity plea and admitted the prior convictions. The jury returned a verdict of guilty as charged in Count I. It also found that he was armed and that he inflicted bodily harm upon the victim. By its verdict on this count the jury recommended that he be imprisoned for life without possibility of parole.

The jury also found that the defendant was guilty of murder as charged in Count II of the information and that he was armed at the time of the homicide. The offense was found to be murder of the first degree and no recommendation was made as to punishment. The death penalty was imposed. A motion for a new trial was denied. This is an appeal from the judgments of conviction and from the order denying the motion for a new trial.

The defendant is about 53 years of age. He is a machinist and machine tool worker. He married his second wife, Geraldine, in the State of Ohio a short time before they came to California, which was about 1951. In February, 1953, under the name of Anthony A. Barr he purchased a revolver in Huntington Park. For some reason best known to themselves he and Geraldine were remarried in Las Vegas, Nevada, on October 7, 1953. The defendant was there married under the name of James A. Bauer. At that time their home was in Norwalk in Orange County. Not long after they returned to their home the defendant gave up his job and was short of funds. He began to examine newspaper advertisements offering for sale automobiles and other personal property. These advertisements were usually anonymous but gave the telephone numbers of the proposed sellers. By telephone the defendant made appointments to see the property offered for sale. By this means he gained access to the homes or apartments of the proposed sellers. This he did on several occasions, giving his name as Bauer, Bower, Barr, Berger and perhaps others. One of the places he thus gained access to was the apartment of Mrs. Belle Brooks whose advertisement offered for sale ''My lovely ranch mink coat. Will sac. $950. Also 6-skin Russian Sable Stole,'' giving her telephone number. This advertisement appeared in local papers on the morning of November 20, 1953. The defendant called Mrs. Brooks on the telephone, gave his name as ''Berger'' and made an appointment to meet her at her apartment a little later on with reference to her advertised furs.

About 1:30 that afternoon he appeared at her apartment and after a few minutes of conversation he flourished a gun at her and ordered her to go to another room in the apartment where he compelled her to lie on a bed face down. He taped her wrists and ankles and tied a kitchen towel around her mouth. He then committed upon her body the infamous crime against nature, a felony denounced by section 286 of the Penal Code. The victim begged the defendant to take the furs and leave. He replied, "I ain't going until you tell me where the diamonds are, or your jewels." After committing the act the defendant cut the telephone wires leading to the apartment, put the stole and other personal property of Mrs. Brooks in a suitcase, threw the mink coat over his arm and departed, saying to Mrs. Brooks: "If you get off that bed for the next fifteen minutes, I have someone standing outside that has been watching you." Mrs. Brooks later found missing, in addition to the furs and the suitcase, a wrist watch, two cigarette cases, a compact and a bracelet. The mink coat was later sold by the defendant for $300. Mrs. Brooks' watch, two cigarette cases, the bracelet and the compact were found in the defendant's home by a deputy sheriff on November 30, 1953. Her stole and suitcase and the revolver which the defendant had purchased in Huntington Park were recovered by the police department in St. Louis, Missouri, after the defendant was taken into custody in that city. The foregoing, in brief, constitutes the factual basis upon which the jury found the defendant guilty on the first count. Although the defendant denied participation in the activities attributed to him by various witnesses who testified concerning interviews and conversations with him in response to newspaper advertisements, including Mrs. Brooks, he does not attack the judgment on the first count on any ground whatsoever.

The defendant's conviction of the charges contained in Count II finds abundant support in evidence from which the jury reasonably might have believed that the following events took place: The defendant had been informed by his wife that a man driving a Mercury automobile with Indiana license plates had forcibly raped her. The defendant did not know the name of the man nor where to locate him but had considered taking some action. He discovered in his wife's purse a slip of paper containing a telephone number. This same telephone number came to his attention while he was engaged in the above mentioned practice of examining newspaper

advertisements for the sale of personal property. Singularly enough it appeared in an advertisement offering for sale a Mercury automobile with Indiana license plates. The defendant had been unable to obtain California license plates for his own car, having lost the "papers" thereon. He particularly desired to obtain "out of state" plates and the advertised automobile would enable him to accomplish that purpose. He called the telephone number named in the advertisement several times seeking to ascertain the identity of the owner of the Mercury car but the man who answered would not divulge the information. Finally, on November 20, 1953, when the defendant again called that number, a person who answered the telephone identified himself as Andrew Kmiec. The defendant stated that he wanted to see Kmiec personally about the affair he had had with the defendant's wife. A meeting was arranged, to be at the Biltmore Hotel in the late afternoon of the following day.

About 4 o'clock in the afternoon of that day he left home in his automobile and drove to Los Angeles where he parked his car in a Pershing Square garage. About 5:15 he met Kmiec and they talked a few minutes. The defendant told Kmiec that he wanted to get this family affair straightened out. They went to Kmiec's car which was parked nearby, and Kmiec introduced the defendant to a Miss McCormick who was in the car. Kmiec had asked her to accompany him and had told her that he was going to see a person interested in the purchase of the car. The defendant asked why he had brought Miss McCormick along, apparently suspicious that Kmiec had brought her along as a witness. Kmiec replied that she knew nothing about the wife's affair and requested the defendant not to say anything about it in her presence, and that he would drop her off later on. The defendant directed Kmiec to drive the car to Whittier so that his wife could see it, and to drive out Sixth Street. Kmiec proceeded as directed. All three sat in the front seat with Miss McCormick in the center. On the way there was some conversation about the sale of the car and caravan charges but nothing about the wife's affair. On the way a stop was made for gasoline, and they then proceeded toward Whittier. Suddenly the defendant ordered Kmiec to stop the car. He flourished a gun and pointed it at Kmiec and ordered him to get into the back seat. Kmiec pleaded for his life, offering the defendant his watch or the car. He also offered to drive home to obtain money and give it to him if the defendant

would let him go. The defendant asked Miss McCormick if she could drive and when she said she could, he ordered her to do so. She drove until he ordered her to stop at a lonely spot with oil wells nearby but no houses. Defendant continued to hold the gun on Kmiec and stated that he was trying to make up his mind whether to let him go. At that Kmiec gagged, put his hands up to his mouth, and then, just as Kmiec dropped his hands, defendant shot him in the chest. As Kmiec fell toward the front seat of the convertible a second shot was fired and Miss McCormick jumped out of the car. She heard a third shot as she ran. When she returned with deputy sheriffs a short time later Kmiec's car was gone and his lifeless body was found lying beside the road.

The car was found the next morning at Carl's Drive-in at Soto and Olympic Streets in Los Angeles, where it had been abandoned by the defendant after he had taken off the Indiana license plates and had placed California plates upon it. Miss McCormick's purse and coat were still in the car. There was blood on the back seat and on the front seat, particularly on the floor near the door on the driver's side. It was ascertained that Kmiec's death was caused by hemorrhage from a bullet wound in the chest. There was also a bullet wound in his back and one in his cheek.

The defendant admitted that after the killing he had driven the Mercury to his home; that he changed his clothes and took the Indiana license plates from the Mercury car; that he had taken the car to the drive-in and abandoned it, and that he then had gone by bus to downtown Los Angeles where he obtained his own car at the Pershing Square garage. On November 23d the defendant and his wife went by automobile to Las Vegas, Nevada. When they returned to California the defendant destroyed the clothes he had worn on the day of the killing and left the state. About two weeks later he was arrested in St. Louis, Missouri.

The defendant was interviewed under oath in the district attorney's office in Los Angeles on December 11, 1953, and the interview was recorded on a tape recorder and was also taken down by a reporter. Relevant portions were introduced at the trial. His testimony on the stand was self-contradictory and evasive and was impeached by his prior sworn statements and admissions. He repudiated the story he had theretofore given and presented a different version at the trial, contending that his later version was the true story and that he had given the previous version merely to protect his wife's reputation. In view of the conflict in the evi-

dence the jury was not required to believe the defendant's final version of the killing. (*People* v. *Borrego,* 211 Cal. 759, 765 [297 P. 17]; *People* v. *Shafer,* 101 Cal.App.2d 54, 59 [224 P.2d 778].) There is abundant evidence to sustain the verdict of murder in the first degree either as a "willful, deliberate, and premeditated killing"; or as one "committed in the perpetration or attempt to perpetrate . . . robbery" of Kmiec's automobile. (Pen. Code, § 189.) The prosecution presented its case on both theories and the jury was fully instructed thereon.

The defendant's sole contention on appeal is that the trial court committed prejudicial error in refusing to submit to the jury an instruction on manslaughter. ■ "It has been repeatedly held that it is reversible error to refuse a manslaughter instruction in a case where murder is charged, and the evidence would warrant a conviction of manslaughter." (*People* v. *Carmen,* 36 Cal.2d 768, 773-774 [228 P.2d 281], and cases cited there.) ■ On the other hand if it must be said as a matter of law that, accepting the defendant's version of what took place, the crime could not have been manslaughter, the defendant was not entitled to such an instruction. (*People* v. *Wolfe,* 42 Cal.2d 663, 671 [268 P.2d 475]; *People* v. *Alcalde,* 24 Cal.2d 177, 188 [148 P.2d 627]; *People* v. *Mitchell,* 14 Cal.2d 237, 241-242 [93 P.2d 121]; *People* v. *Turley,* 50 Cal. 469.)

Manslaughter is defined as the "unlawful killing of a human being, without malice. It is of three kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion.

"2c. Involuntary—in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle;

"3. In the driving of a vehicle. . . ." (Pen. Code, § 192.)

The killing did not occur in the driving of a vehicle. Defendant denied that he shot Kmiec voluntarily. He does not contend that the killing occurred upon a sudden quarrel or heat of passion. He argues that the facts testified to by him would support a verdict that the killing occurred involuntarily, in the commission of an unlawful act not amounting to a felony. Such unlawful act, he asserts, was the drawing of a loaded gun "in a rude, angry, or threatening manner." This is a misdemeanor (Pen. Code, § 417.)

■ Although the defendant's different versions of what took place just prior to the killing are conflicting and inconsistent, he contends that his testimony on direct examination in regard to what took place in the automobile after it had come to a stop showed no more than the commission of a misdemeanor and required an instruction on manslaughter. That testimony is set forth in the footnote.* That testimony

---

*"Q. . . . After you stopped on Painter, what you later learned to be Painter, tell us what happened. . . ." "A. He seen the gun before I said anything. I said, 'You know what this is, Kmiec?' He said, 'Yes, I know what it is.' I said, 'Get in the back seat.' He got in the back seat and I told Miss McCormick to move over, that she would not be bothered; it was just an unfortunate thing that she was along, that she had him to thank for it; that he knew what he was getting into, and that he had no business bringing her along, so Mr. Kmiec kept saying, 'You got the wrong guy, Tony. You got the wrong guy.'" "Q. Then what happened?" "A. No one has called me Tony but my wife. No one knew that nickname." "Q. What happened then?" "A. He kept telling me that I had the wrong man. I said, 'I don't think I have.' He said, 'Look, I will give you my money, I will give you my watch, I will give you my jewelry, I will give you my car and take you home and get you some more money, but don't hurt me.' I seen he was really scared. I said, 'Well, I am trying to decide whether it is worth letting you go or not. You have hurt me more than any man has ever hurt me.'" "Q. What did you mean when you said that? "A. The advantage he took of my wife." "Q. While you were trying to make up your mind whether to let him go or not, had you some time prior to that decided that you were going to do something to him?" "A. I did intend to, but the girl being along changed my mind." "Q. What did you intend to do?" "A. I was going to pistol-whip him." "Q. Did you intend to kill him?" "A. No, I did not." "Q. At any time on that day, November 21st, did you intend to kill Andrew Kmiec?" "A. No, I did not." "Q. After you said, 'I am trying to make up my mind whether to let you go or not,' what happened?" "A. I decided—as soon as I spoke those words, I decided to get out of that car and tell Dolly McCormick what kind of a heel she was with." "Q. What did you do next?" "A. I turned to loosen the door handle on the car, and I couldn't find it. I instinctively turned my head slightly to find the door handle and when I did he landed right on top of me in the front. He had my head doubled down on my chest and his body came over. He brought the gun right over up against both of us. It was unfortunate that the gun was pointed toward him instead of me." "Q. What happened then?" "A. Well, he had one hand on my throat and one on my nose. My nose started to bleed and he let go of my nose and with the hand he released my nose with he grabbed the hand that I had the gun in. In the tussle a shot was fired, shortly after that another one was fired." "Q. Were there more than two shots?" "A. There were three shots fired in close succession." "Q. All right, what happened next?" "A. He was still trying to get the gun out of my hands, and I knew if he got the gun out of my hands he would kill me. I did my utmost to keep the gun from him. We finally landed out in the street on the driver's side of the car." "Q. Who landed out there?" "A. Kmiec and myself." "Q. Then what happened?" "A. He landed on top of me; he got up and he ran. I turned around and got into the car and drove the car away. The last I seen of Kmiec, he was running toward the back end of the car; in fact, he was out of the shadow of the car in the darkness when I picked myself up and got into the car and drove away."

itself shows more than the mere drawing of a gun "in a rude, angry, or threatening manner." By his own admission the defendant used the gun in such a manner as to terrorize the occupants, and to forcibly deprive them of their personal liberty. They were forced at gunpoint to change positions in the car. They were forced to remain in the car while it was parked on a dark road in an uninhabited area during which time the defendant held them at the point of the gun and threatened to kill one of them. These acts as a matter of law constituted at least one felony, that of false imprisonment. Penal Code, section 236, provides that "False imprisonment is the unlawful violation of the personal liberty of another." Where it is effected by violence or menace it is punishable by imprisonment in the state prison for not less than one nor more than ten years and is a felony. (Pen. Code, § 237.) ▮ In *People* v. *Agnew*, 16 Cal.2d 655 [107 P.2d 601], the court stated at page 659: "In defining false imprisonment, it is said in 22 American Jurisprudence, at page 359, 'In order to constitute a case of false imprisonment, it is essential that there be some restraint of the person; but it is not necessary that there be confinement in a jail or prison. Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty or is compelled to remain where he does not wish to remain, or to go where he does not wish to go, is false imprisonment. The wrong may be committed by acts or by words, or both, and by merely operating upon the will of the individual or by personal violence, or both. . . .' " (See also *People* v. *Wheeler*, 73 Cal. 252 [14 P. 796] ; *Ex parte Keil*, 85 Cal. 309 [24 P. 742].)

▮ The defendant's last account at the trial of what took place in the automobile immediately before the homicide should be considered in connection with his admitted conduct prior thereto beginning with the commencement of the journey in the Mercury car and continuing throughout its course, and culminating in the claimed final struggle. That admitted conduct of the defendant constituted false imprisonment as a matter of law. Under the circumstances the killing could not, on any permissible theory, be deemed involuntary "in the commission of an unlawful act, not amounting to a felony," and therefore did not come within the statutory definition of manslaughter.

The defendant had a full and fair trial. The court gave adequate instructions responsive to the evidence on first and

second degree murder. As there was no evidence which would warrant a conviction of manslaughter the court properly refused to instruct the jury thereon.

The judgments and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied March 3, 1955.