[Crim. No. 7765. Second Dist., Div. Four. Mar. 12, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. RAYMOND BERNARD FINCH et al., Defendants and Appellants.

Cooper & Nelson, Maxwell S. Keith, Harold J. Ackerman, Jerry Giesler and Donald R. Bringgold for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—The Los Angeles County Grand Jury returned an indictment charging defendants with murder, in

violation of section 187 of the Penal Code, in count I, and conspiracy to commit murder, in violation of section 182 of the Penal Code, in count II. Several overt acts were alleged in the conspiracy count. The first and second jury trials resulted in mistrials being declared because of the inability of the jurors to agree upon a verdict. In a third jury trial, both defendants were found guilty of conspiracy to commit murder; defendant Finch was found guilty of murder in the first degree, and defendant Tregoff guilty of murder in the second degree. On the issue of penalty the jury fixed defendant Finch's sentence at life imprisonment on both counts and defendant Tregoff's penalty on the conspiracy count at life imprisonment. Motions for a new trial were denied. Defendant Finch was sentenced to life imprisonment on both counts. Defendant Tregoff was sentenced to state prison for the term prescribed by law on count I and life imprisonment on count II. Sentences were ordered to be served concurrently. Each defendant appeals from the judgment of conviction and from the order denying the motion for new trial.

Before the commencement of the third jury trial defendant Finch entered pleas of prior acquittal of conspiracy, former conviction of second degree murder, and once in jeopardy as to both counts alleged. Defendant Tregoff entered a plea of prior acquittal of conspiracy and once in jeopardy for the same offense. The special pleas were submitted to the jury and the jury found for the People on each of such pleas.

It will only be necessary to present an outline of the evidence since defendant Finch does not challenge the sufficiency thereof and defendant Tregoff challenges it only with respect to sustaining the verdict against her of conspiracy to commit murder in the State of California.

Doctor and Mrs. Finch were married in December 1951. Both had been married previously and divorced. She had a daughter by a previous marriage. In April of 1953 a son, Raymond, was born to Doctor and Mrs. Finch. Dr. Finch and a brother-in-law were operating a medical clinic in the city of West Covina. The family lived in a hilltop home overlooking the city.

In 1955 defendant Tregoff became employed as receptionist at the medical center. In August of 1956 she became Dr. Finch's medical secretary. An illicit relationship developed between the two which culminated in her becoming his mistress. She obtained an interlocutory decree of divorce

from her husband in January of 1959. In 1958 Mrs. Finch learned of the meretricious relationship and on March 21, 1959, Dr. Finch was served with a divorce complaint and an order to show cause by which Mrs. Finch sought temporary alimony and child support.

During May and June 1959 defendant Tregoff was living in Las Vegas, Nevada. While there, through an intermediary, she met one Jack Cody. Cody testified in substance that the defendants hired him to murder Mrs. Finch and that he was paid the sum of $1,000 in cash to accomplish this act. Cody did nothing for the money paid him nor, according to his testimony, did he ever intend to do anything. Both defendants admitted meeting Cody and admitted they hired him. However, they asserted their purpose was to obtain evidence that might be used against Mrs. Finch in the pending divorce action and not to kill her.

Defendant Finch was a frequent visitor in Las Vegas for the purpose of seeing his paramour. In the late evening of July 17, 1959, Finch took a plane to Las Vegas. He carried with him a large suitcase and an attaché case. Carole Tregoff met Finch at the airport and they talked until the early morning hours of July 18. In the evening of that day the two started driving to West Covina in defendant Tregoff's car. They were carrying with them an attaché case containing a .38 revolver, live cartridges, a butcher knife, two hypodermic needles, two syringes, two 10-foot coils of laundry rope, a flashlight, seconal in pill and liquid form, and various other items. Upon arrival in West Covina they parked in the South Hills Country Club parking lot at about 10:30 p.m. in a position almost directly below the Finch residence. At approximately 11:40 p.m. the West Covina Police Department received a call from the Finch maid, Marie Ann Lidholm. Two police cars arrived at the Finch home about midnight and one of the officers discovered the body of Mrs. Finch lying on the back lawn of the home of defendant Finch's father adjoining defendant Finch's home.

Mrs. Finch met her death as a result of a gunshot wound in the back fired from a distance of approximately 2 to 4 feet. The evidence supported the prosecution's contention that defendants came to West Covina with the preconceived plan of murdering Mrs. Finch. Once on the Finch property they concealed themselves and lay in wait for her. When she arrived home she drove into the garage without seeing defendants. As she was getting out of her car defendant Finch

struck her with a gun butt causing a skull fracture which produced bleeding from her left ear. She was stunned temporarily but recovered, and a struggle between Dr. and Mrs. Finch ensued in the garage. Defendant Tregoff withdrew from the scene and hid herself in bushes near the house. During the struggle Mrs. Finch called for help. Her call was answered by Marie Ann Lidholm. The latter entered the side door of the garage and turned on the lights. She saw Mrs. Finch lying on the floor and defendant Finch standing near her. Finch rushed up to Miss Lidholm, switched off the lights, grabbed her head and knocked it against the wall three or more times. He told her to get into the car. At first she did not do so. Then she noticed Finch was holding a gun. He fired a shot and she got into the back seat of the car. Finch told Mrs. Finch to get into the car and get the car keys. She got in on the passenger side. Finch entered on the driver's side and then he said, ''If you don't get them I'll kill you.'' Mrs. Finch left the car and ran toward the garage door. Finch also rushed out of the car. Marie Ann Lidholm heard her shout for help and heard a second shot. The struggle between the parties culminated with Mrs. Finch running from the garage toward her father-in-law's house with Dr. Finch behind her. Miss Lidholm went back into the house and called the police.

The prosecution claimed that Dr. Finch had a gun with him when in pursuit of his wife and that he deliberately shot her while she was seeking refuge at her father-in-law's; that he pursued her and shot her in the back at close range and then fractured her skull with the gun butt while she lay flat on her back on the ground.

Defendant Finch claimed the second shot was accidental; that the struggle in the garage started when Mrs. Finch herself produced a gun from the car upon being approached by the two defendants seeking to talk to her; that when Mrs. Finch left the garage she had the gun and that Dr. Finch chased her for the purpose of taking it from her; that he seized the gun during another brief struggle on the driveway and it fired accidentally while he was attempting to throw it away.

Defendant Tregoff remained hidden in the shrubbery and eventually fled the scene driving her own car back to Las Vegas. Defendant Finch appropriated someone else's automobile and fled to Las Vegas. Defendant Tregoff found him in her apartment. He was arrested the next day in Las Vegas.

Both defendants contend the court committed prejudicial error in its failure to submit to the jury certain instructions on their special pleas of once in jeopardy, former conviction, and former acquittal. Defendant Finch contended that he had already been acquitted of the offense of conspiracy to commit murder by the jury in the second trial which voted unanimously to acquit him of the offense. Likewise, he contended that he had already been convicted of the offense of murder in the second degree because of a verdict of that same jury. He asserted this verdict failed to determine the degree of the crime of murder and therefore, pursuant to the provisions of section 1157 of the Penal Code, the degree must be construed to be that of the lesser crime, in this case murder in the second degree. He contended no judgment was rendered on these verdicts because the judge presiding at that trial failed, neglected, and refused to receive them and therefore prevented a judgment from being rendered thereon.

Defendant Finch's pleas of once in jeopardy for the offenses of murder and conspiracy were based upon the action of the judge in the second trial declaring a mistrial and discharging the jury without having received these verdicts and without entering a judgment thereon.

Defendant Tregoff contended similarly that she had been acquitted of the offense of conspiracy to commit murder because the jury at the second trial voted unanimously to acquit her of that offense. She also contended she had been once in jeopardy for the offense of conspiracy because this same jury found her not guilty of such offense.

■■ ■■ Eight of the jurors from the second trial were called to testify at the third trial as to their deliberations. Although not wholly in agreement on all details it appears from their testimony that on October 27, 1960, the foreman of the jury at the second trial summoned the bailiff and indicated to him that the jury had reached agreement on three counts but were in disagreement on one and asked if the judge would accept such a verdict. The bailiff said he would ask the judge and returned later to say that the judge said to keep deliberating.

On November 7 the judge inquired of the jury in open court as to whether they had arrived at a verdict and was told by the foreman that 11 jurors thought they were hopelessly deadlocked, one did not; that they had taken 59 ballots. The court declared a mistrial.

At the third trial each defendant requested of the court that certain special interrogatories be submitted to the jury, which the court refused. These interrogatories would have asked the jury to determine whether the jury in the second trial on October 27, 1960, did decide upon the following verdicts: as to defendant Finch, guilty of murder in the second degree and not guilty of conspiracy to commit murder; as to defendant Tregoff, not guilty of conspiracy to commit murder, and "undecided" as to her guilt or innocence on the charge of murder; whether the judge presiding at the second trial was informed by the bailiff that the jury had reached three verdicts but were undecided as to one of the counts without specifying which one; and whether the judge upon receiving the information did forthwith cause the jury to be brought into open court and there in the presence of both defendants, their counsel and the prosecuting attorneys, ask the jury if they had reached any verdicts.

In connection with the jury verdicts on these special pleas of defendants the court at the third trial availed itself of its constitutional privilege of commenting on the evidence. The court instructed the jury that the questions of whether or not the facts established former jeopardy, former conviction or former acquittal were questions of law. The court stated in part that, "it is my opinion, both as a matter of law and fact, that no verdict or final determination of any issue was ever reached in the preceding trial and, obviously, no verdict was ever declared, or rendered, or recorded in court. I therefore advise you to find for the People and against the defendants on these issues. I am required to inform you, and do so, that you need not accept this advice and are free to disregard it if you wish, because the final judgment in the matter must be yours."

Defendants assert that since there was a conflict in the testimony of the eight juror witnesses as to whether verdicts had been agreed upon it was incumbent on the judge at the third trial to submit that factual issue to the jury. The court did submit the special pleas to the jury for determination. True, he commented on the evidence as was his privilege but he left the ultimate decision to the jury and told them they were not bound to follow his advice.

The case was submitted to the jury March 22, 1961. The following day, March 23, the jury signed verdicts in favor

of the People on the special pleas. These were returned together with their other verdicts on March 27.

We find no error in the judge's comments to the jury or the procedure followed by him with respect to these special pleas. ██ Assuming that the judge in the second trial had been informed the jury had reached unanimity as to three counts and was undecided as to a fourth, he was under no legal duty to instruct the jurors to return to court in order to render verdicts. Section 1160 of the Penal Code permits the jury to make a separate return of its verdict on each count when more than one count is charged. (*People* v. *Rigney*, 55 Cal.2d 236, 246 [10 Cal.Rptr. 625, 359 P.2d 23].) There is no requirement in law, however, requiring the trial judge to receive verdicts on part of the counts and return the jurors for further deliberation as to the other counts. Clearly, this was a matter for the judge's discretion. The second trial had been even more lengthy and more arduous than the first; it had lasted nearly four months and had produced a daily transcript of 12,593 pages. It was to the interest of the prosecution and the defense that every effort be made to reach a final determination as to all counts. In actuality, some of the jurors testified that the ballots which had been taken had been merely tentative with the jurors reserving the right to reconsider their votes after the rereading of certain testimony. This is borne out by the fact that upon their final return to the court the jurors acknowledged that they were hopelessly deadlocked without agreeing to a verdict on any count.

██ As stated in *Paulson* v. *Superior Court*, 58 Cal.2d 1, 7 [22 Cal.Rptr. 649, 372 P.2d 641], ''Ordinarily the trial judge should not discharge a jury on the ground that there is no reasonable probability that the jury can agree without questioning the jurors individually as to such probability. [Citations.] ██ 'The statute does not provide just what proceeding shall be taken to determine the probability of an agreement, but no better method occurs to us than to obtain from the jurors an expression of their judgment, and the court, in the exercise of the discretion committed to it, may give such weight to this opinion as the surrounding circumstances seem to demand.' [Citations.]'' This procedure was followed here. ██ It was not unreasonable for the judge in the second trial to assume that the jurors could reach or agree on a verdict and to direct them to continue

deliberating. ■ The ultimate discharge of the jury by the court cannot be said to be an abuse of discretion.

■ "The length of time the jury should be kept deliberating is a discretionary matter with the trial judge." (*People* v. *Casserio,* 16 Cal.App.2d 223, 228 [60 P.2d 505].)

■ As stated in *People* v. *Sullivan,* 101 Cal.App.2d 322, 328 [225 P.2d 645]: "The applicable statute is section 1140 of the Penal Code, which declares that except as otherwise provided by law the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties or 'unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' This clearly commits to the trial judge, not to the jury, the determination of the question whether or not 'there is no reasonable probability that the jury can agree.' "

■ Both defendants contend the trial court committed reversible error in admitting testimony relating to the "state of mind" of the deceased. Five witnesses were called to testify as to statements made by Mrs. Finch. A brief summary of the state of mind evidence is as follows: The attorney who represented Mrs. Finch in the divorce action testified that she told him that on May 16, 1959, defendant Finch had broken into her house and beaten her; on May 18, 1959, she told him of an altercation with her husband which took place on May 15, that defendant Finch had hit her with a gun, choked her and that she was in fear of her life; that Finch told her he had someone in Las Vegas to whom he could pay a thousand dollars to kill her.

Her maid testified that one morning in the middle of May Mrs. Finch said, "My husband tried to kill me last night;" that she showed the maid the bandage on her head and said he tried to get her clothes on and take her out in the car and was going to push the car over a cliff and he was going to take her off in the desert and do something; that in the struggle she fell over the edge of the bedside table and defendant Finch had taken her down to the hospital, and put the stitches in himself. The maid testified she saw blood on Mrs. Finch's pillow and bed; that she overheard a quarrel in the bedroom; that the deceased ran down the hall and asked her to call the police; that Mrs. Finch told defend-

ant Finch "I am not going to let you push me around or throw me to the floor."

Certain affidavits from the divorce action were offered into evidence. One such affidavit of the deceased dated May 18, 1959, read in part as follows: "Many acts of cruelty inflicted on her by defendant . . . plaintiff [deceased] is under severe nervous strain due to the inhuman acts inflicted upon her by defendant and that it would be impossible for her to work in any capacity for many months . . . on the evening of May 15, 1959 defendant Raymond Bernard Finch threatened to take the life of your plaintiff [deceased] and did in fact attempt to strangle her and did in fact damage her to the extent that numerous stitches were in her head."

Another affidavit from the divorce action was read into evidence stating in part that "on June 25, 1959, the defendant [Finch] broke into plaintiff's [deceased's] home, struck her and called her vile and abusive names." Another affidavit dated July 7, 1959, stated in part, "that specifically on June 25, 1959, defendant entered the home of your plaintiff; attacked her and struck her to the ground; locked the door so that the housekeeper could not render assistance . . . in the presence of the minor child . . . took your plaintiff's automobile by force . . . as a result of this attack plaintiff has been under a doctor's care for serious injuries sustained to her back when she was brutally beaten to the floor."

A witness, Mrs. Helrich, testified she observed deceased on one occasion when she had a bandage over her eye; deceased told her defendant Finch had "hit her and pushed her and held her down and threatened her with her life in several ways . . . she got up somehow and he hit her again very hard." Deceased further told her she did not know "whether his blow or whether what she hit when she went down caused the cut, but when she woke up there was blood all over where she was lying;" that on another occasion he had thrown her across the room and that she hit the wall or floor and injured her back. Deceased further told her that people were trying to get her to carry a gun and that if she ever saw the defendant with a gun she would run; that she didn't even hope to live until Christmas; that as far as hiding was concerned it was no use, he would follow her; that defendant Finch would not obey a restraining order.

Minette Haber gave similar testimony and related a conversation with Mrs. Finch on the day before she was killed. Mrs. Finch said that Finch had told her that if she didn't

take that contempt of court back he would do something within 24 hours.

Such hearsay testimony, including the affidavits from the superior court files of the divorce action, was offered by the People as part of their case in chief on the theory that these declarations by Mrs. Finch were admissible to show her state of mind.

In *People* v. *Hamilton,* 55 Cal.2d 881, 893 [13 Cal.Rptr. 649, 362 P.2d 473], the Supreme Court referred to the admissibility of state of mind evidence as follows: "Undoubtedly, in a proper case, and in a proper manner, testimony as to the 'state of mind' of the declarant, where there is an issue in the case is admissible. . . ." The court noted (p. 889) that it was after the defense had rested that the prosecution, over defense objections, introduced evidence of the declarations of decedent ". . . to the effect that not only was she afraid of defendant but that he had threatened her with death on many occasions, had beaten her and had forced his attentions on her against her will. . . . But all of these hearsay declarations were admitted to show the 'state of mind' of [decedent], and not for the purpose of proving the truth of the charges. The trial judge ruled that 'state of mind' was in issue because the defendant had put it in issue by his testimony that he and [decedent] were friendly, and that she had invited him to her home the night that she was killed. These declarations were admitted, ostensibly to show that [decedent] was not friendly with defendant, and that her 'state of mind' was such as to cast doubt on defendant's testimony."

Likewise, in the case at bench the state of mind evidence was offered to show that the deceased was in mortal fear of her husband and for that reason would never have gone home on the night of July 18 had she known or suspected defendants would be there; that she would have driven away had she seen them; that being afraid of guns, she did not have her husband's .38 with her in the car, she did not draw the gun and point it at defendant Tregoff and that defendant Finch would not fracture her skull and strike her with the gun in self-defense as he contended had happened. Clearly, in this case, as in *Hamilton,* the state of mind of the deceased (her fear of defendant Finch) was properly in issue.

In *Hamilton* the court pointed out that (pp. 898-894): ". . . there are and should be rigid limitations on the admission of such testimony. . . . When the declarations are of such a nature as to be obviously prejudicial, and where

any possible proper benefit to the prosecution is far out-weighed by its prejudicial effect to the accused, such evidence should be excluded.'' The court noted further (p. 895) : ''. . . some of the otherwise admissible declarations of the decedent as to her fear of defendant because of threats (as well as the great mass of inadmissible declarations) were not made under circumstances that indicated that they were probably trustworthy. They were made by [decedent] to explain why she was carrying a gun, and when she was trying to escape going to jail for doing so.'' The decedent in *Hamilton* had been arrested for carrying a gun and many of the declarations by her which were received in evidence had been made to police officers following her arrest and were therefore suspect as perhaps having been made falsely merely to justify her carrying of the weapon. The fact that the testimony consisted in the main of statements of police officers had a cumulative effect which the court stated (p. 893) ''. . . was to tell the jury repeatedly, mainly through the mouths of law enforcement officers, that on innumerable occasions defendant had beaten or sexually assaulted his former wife and had threatened to kill her.''

In the case at hand the declarations by Mrs. Finch, which were received in evidence, were not made under circumstances which cast doubt as to their reliability; she was under no compulsion to free herself of any criminal charge as was the deceased in *Hamilton*. Furthermore, unlike *Hamilton*, there was no parade of law enforcement officers presenting the state of mind testimony. Here, the testimony was by her maid, her lawyer, two personal friends, and a doctor who had treated her for her injury on June 25, in addition to her affidavits taken from the divorce files of the superior court.

It is argued that the fact that Mrs. Finch was engaged in a divorce proceeding with her husband, in which divorce action she sought all the community property of the parties, did have the effect of casting suspicion as to the truthfulness of the statements made by her to her friends, doctor, and lawyer about the conduct of her husband. Mrs. Finch, however, was under no compulsion to manufacture testimony justifying her position in the divorce case since she had known of the adulterous conduct between her husband and defendant Tregoff at least as early as December 1958. Furthermore, the record indicates that Mrs. Finch expressed willingness to enter into reconciliation proceedings brought by

her husband.[1] This would tend to dispel any inference that she wanted a divorce if one could be avoided or that her main concern was to build a case which would result in her being awarded the community assets. Also, there was other substantial evidence supporting the declarations she made to others; she had installed chains on the doors of the house; she kept a bumper jack beside her bed; she left home twice during the last two months preceding her death, staying away for long intervals, returning only when her husband was absent; witnesses testified she was very, very nervous, extremely upset, was losing weight and could not eat. Thus, the fact that Mrs. Finch was living in a state of fear and apprehension was amply borne out by circumstantial evidence. The circumstances under which the statements were made by Mrs. Finch to the witnesses who testified to them were such, in our opinion, as to render the testimony ''reasonably trustworthy.'' (*Hamilton,* at p. 893.)

 Certain of the evidence referred to past conduct of defendant Finch, as did the mass of the evidence ruled inadmissible in *Hamilton*. In *Hamilton* the Supreme Court stated (pp. 893-894), '' . . . there are and should be rigid limitations on the admission of such testimony. One of these limitations is that such testimony is not admissible if it refers *solely* to alleged past conduct on the part of the accused. This is so because to try and separate state of mind from the truth of the charges is an almost impossible task. The serious prejudice from such evidence is obvious. When the declarations are of such a nature as to be obviously prejudicial, and where any possible proper benefit to the prosecution is far outweighed by its prejudicial effect to the accused, such evidence should be excluded.'' (Italics added.)

In *Hamilton* portions of the state of mind evidence were held to be prejudicial: ''By these declarations the prosecutor was able to tell the jury, mainly through the mouths of law enforcement officials, that on innumerable occasions defendant had brutally beaten his ex-wife, and otherwise assaulted her. In a not very subtle way it told the jury what kind of man it was that was before them on trial. . . . [I]t must inevitably follow that if the jury believed that [decedent] was in fear of her life, it was only because defendant had in fact beaten and otherwise assaulted her.

---

[1]Defendant Finch testified he had not filed the conciliation proceedings in good faith but for purposes of delay.

Logically, it is impossible to limit the prejudicial and inflammatory effect of this type of hearsay evidence.'' (P. 896.)

Here, Finch himself testified to his own brutality in his fight with his wife on the evening of the fatal shooting. Thus the jury did not have to resort to hearsay testimony concerning past actions of the defendant to arrive at a conclusion as to the type of man it was that was before them on trial. Finch testified that during the fight he tripped, flipped his wife around and fell down, jerking her with him so that her head struck the wall; she began calling for help; he kicked her feet out from under her; he heard steps, pulled her head back, wrenched the gun away from her and hit her with it and she fell back on the cement; when the maid entered, fearing that she had a rifle which he had taught her how to use, he shoved her up against the wall, her head banging against the plaster, and she began to sag; he saw Mrs. Finch in a half-seated position; saw blood coming out of her ear, and realized she had a basal skull fracture; he told her to get in the car; he intended to take her to the hospital and sat her on the car seat; he demanded the car keys and told her if she did not give them to him he was going to ''slug her''; Mrs. Finch got out of the car while he was searching her purse for the keys. He testified he saw her point the gun up the driveway but not at him; he seized her wrist and knocked the gun from her hand; when he picked up the gun he ''went to throw it away and it went off''; Mrs. Finch was about 2 feet away; she moved down the steps and crumpled at the bottom. He stated that he had struck his wife over the head during the fighting so there would be no more wrestling with the gun; he admitted there was no reason why he couldn't have unloaded the gun or walked out of the garage.

Thus, it cannot be said under the circumstances in this case that the testimony of witnesses as to Mrs. Finch's declarations about Finch's prior conduct toward her, interwoven as it was with her statements of his threats and of her fear of him, could have had the prejudicial and inflammatory effect which it had in the *Hamilton* case. Here, the jury could well believe that Mrs. Finch had full reason to be in mortal fear of her husband from his own testimony as to his conduct toward her on the night of the shooting.

In *Hamilton* the Supreme Court noted that (p. 899) ''Again and again [the prosecutor] asserted that he had

proved the truth of the matters asserted in the declarations of the deceased, when he knew that the only 'evidence' of them was the declarations themselves.'' For example, he read the accusatory declarations contained in the deceased's diary and argued that they correctly depicted what had happened on those days.

While both defendants, in the case before us, contend that the prosecutor in his argument to the jury made repeated references to certain portions of the state of mind testimony without, in the particular instances, explaining the limited purposes for which such testimony was received, such isolated instances must be read in their context and it cannot be said upon a review of the record in this case that the jury was not repeatedly admonished as to the limited purposes for which such evidence was received. Unlike *Hamilton* wherein the court criticized the prosecutor for failure to explain the limited purposes for which the evidence was to be received, in his opening statement, in the case at hand the prosecutor was quite circumspect in his reference to such testimony in his opening statement. It is noteworthy that counsel for defendant Finch state in their opening brief that the trial judge '' . . . gave considerable thought to the admissibility of the 'state of mind' evidence and thoroughly searched the California cases on the subject with the aid of counsel for both the People and defendants. He came to the conclusion that the state of mind evidence was admissible under the authority primarily of *People* v. *Atchley,* 53 Cal.2d 160, 171, 172 [346 P.2d 764], . . . provided, of course, that none of the declarations were offered to prove the truth of the assertions contained therein.'' In fact, counsel concedes '' . . . the court was assiduous in admonishing the jury throughout the trial as to the limited purpose of the state of mind evidence and in his formal instructions repeated how the jury were to consider this evidence consistent with his prior admonitions.''

In *People* v. *Atchley,* 53 Cal.2d 160, 172 [346 P.2d 764], it was held this type of evidence was not objectionable as hearsay. The court declared ''It tended to prove her fear of defendant, which was relevant to defendant's claim that she was the aggressor in a struggle for the gun.'' The particular evidence which was received in *Atchley* consisted of a letter written by the decedent to a judge just two days before her death. It alleged that the defendant had made certain car sales without a license and in addition told of his

threats and of her fears of him. The letter (without limiting instruction) was admitted to show the state of mind of the decedent and not to show that the threats were actually made. As in the case before us, the admitted hearsay evidence was interwoven with allegations of past conduct. Nevertheless the court ruled that the admission of the evidence was proper and under the circumstances of that particular case was not prejudicial.

In *People* v. *Brust,* 47 Cal.2d 776, 784-785 [306 P.2d 480], an important theory of the defense was that a long continued provocatory course of conduct of the decedent culminated in bringing defendant to a point where his capacity for cool deliberation was impaired. Under this theory the victim's expressions of hostility to defendant tended to show the actual existence of the hostility. "Evidence of circumstances which would tend to excite defendant's anger against his victim may be admitted on defendant's behalf as tending to show provocation and passion, and therefore excusability or a lesser degree or lower class of crime. . . . Declaration [that on the afternoon before she was killed the victim stated she was going to get in touch with defendant and get some more money out of him] . . . is also relevant, for it is a declaration of the victim's intent to behave provocatively toward defendant. [Citing cases.] . . . The death of the declarant creates the necessity for resort to hearsay and the declarations, being those of a present existing state of mind, made in a natural manner and not under circumstances of suspicion, carry the probability of trustworthiness."

It is the circumstances in each case which must govern and the trial judge has the responsibility of weighing such circumstances and of determining whether the prejudicial effect to the accused of the particular declarations outweighs any possible benefit to the prosecution. (*People* v. *Hamilton, supra,* 55 Cal.2d 881, at 894.)

In *People* v. *Merkouris,* 52 Cal.2d 672, 682 [344 P.2d 1], certain declarations that defendant had threatened the victims were admitted, not to prove the truth of that fact directly, but to prove the fear in the minds of the victims.

"This court has declared that 'under certain circumstances declarations are admissible to prove a state of mind at a particular time although uttered before or after that time, apparently on the theory that under these particular circumstances "[t]he stream of consciousness has enough continuity

so that we may expect to find the same characteristic for some distance up or down the current." [Citing authorities.]' [Citations.]" (*People* v. *Hamilton, supra,* 55 Cal.2d 881, 894.)

Defendant Tregoff asserts that none of the state of mind testimony related to her and therefore it should not have been admitted in evidence as against her. The trial court overruled such objection on the theory that a conspiracy having been charged the state of mind of the deceased as to one of the conspirators made the testimony admissible against both. Furthermore, disregarding the conspiracy charge, since the evidence warranted the jury in concluding that defendant Tregoff aided and abetted defendant Finch in the actual killing of Mrs. Finch it was admissible against her as well as against him. We hold that this ruling was correct and that under the repeated admonitions of the court and its final instructions to the jury with respect to such state of mind evidence there was no error in the admission of it for the limited purposes for which it was offered.

Defendant Tregoff contends the court committed error in receiving in evidence certain testimony given by her at defendant Finch's preliminary hearing at a time when she was not a defendant. The privilege against self-incrimination under article I, section 13 of the California Constitution must be claimed or it is waived. It is settled that a witness is required to claim this privilege, that it is a purely personal privilege, solely for the benefit of the witness and that it is deemed waived unless invoked. (*Rogers* v. *United States,* 340 U.S. 367, 370-371 [71 S.Ct. 438, 95 L.Ed. 344, 19 A.L.R.2d 378]; *People* v. *White,* 124 Cal.App. 548, 557 [12 P.2d 1078]; *People* v. *Eiseman,* 78 Cal.App. 223, 250 [248 P. 716].)

The record reflects that defendant Tregoff did not claim the privilege against self-incrimination at defendant Finch's preliminary hearing. Her testimony was freely and voluntarily given. The fact that she appeared as a witness in response to a subpoena does not imply compulsion to give testimony against herself. During her examination the district attorney asked her if prior to the death of Mrs. Finch she had had sexual intercourse with Dr. Finch, to which she replied, "No, this was not a cheap relationship." The question was then repeated and she replied, "I prefer not to answer it other than I did." When the judge presiding at the hearing told her her answer was nonresponsive and that he

was waiting for her answer she said, "I am sorry, I am sorry" and commenced crying, whereupon the judge declared a recess and directed the bailiff to take the witness and her stepmother into his chambers. While defendant Tregoff was recovering her composure in chambers the judge told her that he did not care whether she answered the particular question or not; that the decision was up to her and that he would not regard a refusal to answer it as a contempt. He did say to her, according to his testimony at the trial, that there was a lot of curiosity and tension among the spectators at the hearing and stated, "I think, if I were you, I would relieve that tension by answering the question, but that is up to you. It is purely voluntary on your part. You can answer it or not answer it, just as you please."

Upon resumption of the proceedings, after the recess, the judge asked her whether she was ready to answer the question; the question was repeated and she answered it in the affirmative.

Several other questions followed concerning her presence at the scene of the crime, at which point the prosecutor announced his intention to arrest her on suspicion of murder. The prosecutor testified at the third trial that he first formed his suspicion of her complicity and determined to have her arrested and charged during this recess and not before. Prior to the commencement of the preliminary hearing it was clear that both the police and the prosecutor knew of the amorous attachment between the two defendants. But it is apparent that no evidence had been developed up to that point directly involving defendant Tregoff in either the planning of the murder of Mrs. Finch or in the execution of that murder.

The time at which the prosecution first formed a firm suspicion that defendant Tregoff was more deeply involved in the actual killing of Mrs. Finch becomes quite important for the reasons outlined in such cases as *State* v. *Finch*, 71 Kan. 793 [81 P. 494]; *People* v. *Nachowicz*, 340 Ill. 480 [172 N.E. 812]; *People* v. *Smith*, 257 Mich. 319 [241 N.W. 186]; and *Harrison* v. *State*, 69 Tex. Crim. Rep. 291 [153 S.W. 139]. These cases are authority for the proposition that testimony given at a preliminary proceeding (such as at a coroner's inquest) is not, as a matter of law, involuntary even though the witness attends in response to a subpoena, where the witness is not in custody, has not previously been accused, is not under suspicion, and is not called

with a design to incriminate him. The evidence indicates this was the situation presented at the time of the holding of the preliminary hearing on the charges against defendant Finch and therefore the introduction in evidence at her trial of testimony given by her at such hearings was not improper.

In such cases as *People* v. *O'Bryan,* 165 Cal. 55 [130 P. 1042], relied upon by defendant Tregoff, the defendant had already been arrested and was taken before the grand jury as an avowed suspect. The court said at page 61, "The constitution protects a person from being *compelled* to be a witness *against himself.* If, at the time he appears, no accusation, formal or informal, has been made against him, he does not, in testifying, become a witness against himself. Or if, even though charged with crime, he voluntarily gives evidence against himself, his rights are not infringed by the use of such evidence thereafter."

It should be said parenthetically that the judge who presided at defendant Finch's preliminary hearing testified he recalled giving "the constitutional rights" to all persons at the opening of the preliminary hearing. However, the transcript of such proceeding does not contain such statement. The judge explained that it was not the custom of reporters to report or transcribe such opening statements. Several persons who were present at the time, including Dr. Finch's attorney, defendant Tregoff and her stepmother, testified that they did not hear him make such a statement. Assuming that the judge did give such admonitions this would dispose of any issue on this question for it is defendant Tregoff's contention that there was a duty to warn her of her rights. While we deem the fact that defendant Tregoff was not in custody, had not been previously accused, was not under suspicion and was not called with a design to incriminate her to be controlling on this issue, it should be noted that by the time she appeared at the preliminary hearing she had been warned by the police on several occasions that whatever she said concerning the affair might be used against her.

In a statement given and signed by her, prior to the preliminary hearing, in which defendant Tregoff was questioned by officers concerning the murder of Mrs. Finch, she was advised by the officers, and signed a statement as follows: "Anything I say may be used as evidence in a court of law." She advised the officers she had told the truth and

was willing to go to court and testify. Prior to giving this statement the Las Vegas officers cautioned her that she was not compelled to give the statement and that if she did say anything it might be used in evidence against her. Thus, in fact, she was forewarned, although the officers were under no legal duty whatever to advise her of her rights. (*People* v. *Hoyt*, 20 Cal.2d 306, 314 [125 P.2d 29]; *People* v. *Ramirez*, 113 Cal.App. 204, 207 [298 P. 60].)

Defendant Tregoff also contends the trial court erred in refusing to instruct the jury as to the lesser included crime of manslaughter. Jury instructions must be responsive to the issues and are determined by the evidence. (*People* v. *Carmen*, 36 Cal.2d 768, 772-773 [228 P.2d 281].) We agree that it is reversible error to refuse a manslaughter instruction in a case where murder is charged and the evidence would warrant a conviction of manslaughter. If, however, there is no evidence that would support a conviction of manslaughter, it is not error on the part of the trial court to refuse manslaughter instructions. (*People* v. *Zilbauer*, 44 Cal.2d 43, 49, 50 [279 P.2d 534]; *People* v. *Sutic*, 41 Cal.2d 483 [261 P.2d 241]; *People* v. *Alcalde*, 24 Cal.2d 177 [148 P.2d 627]; *People* v. *Mandell*, 48 Cal.App. 2d 806 [120 P.2d 921].)

In *People* v. *Carmen*, *supra*, 36 Cal.2d 768, the court in commenting on the settled rule that instructions must be responsive to the issues stated the evidence need not be strong or compelling in any way to require an instruction; it is sufficient that there is some evidence to raise the issue. This holding is in no way contrary to the decision in *People* v. *Mitchell*, 14 Cal.2d 237, 242 [93 P.2d 121], where the court stated that it was not prejudicial to refuse an instruction on manslaughter. In the latter case, under instructions calling for a verdict for first degree murder or an acquittal, the jury found murder in the first degree, calling for the death penalty and not life imprisonment. Also, it should be noted that in that case the court found defendant's evidence supporting manslaughter ''beyond belief.'' In *People* v. *Mott*, 211 Cal. 744 [297 P. 23], no evidence was offered to support a finding of manslaughter, and refusal of a proposed instruction was held to be proper.

In the case at bench defendants submitted instructions essentially stated in the terms of Penal Code section 192.

These requested instructions were refused. As to voluntary manslaughter defendant Finch contended and

offered evidence intended to negate any "heat of passion" or "sudden quarrel" thus excluding the applicability of an instruction on voluntary manslaughter. The theory defendant Finch presented was that the gun was discharged accidentally. Adequate instructions were given on accidental homicide. Accordingly, the court was correct in deciding as a matter of law that voluntary manslaughter could not be found under the evidence adduced by the defense. (*People* v. *Wolfe*, 42 Cal.2d 663, 672 [268 P.2d 475]; *People* v. *Mitchell*, 14 Cal.2d 237, 241-242 [93 P.2d 121]; *People* v. *Mott*, 211 Cal. 744, 748 [297 P. 23].

With respect to involuntary manslaughter the jury would have had to determine that if the killing was accidental the accident was due to Finch's culpable negligence. It would have been necessary for the jury to decide that he acted in an "aggravated, culpable, gross, or reckless" manner, a manner so imprudent as to be "incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences." (*People* v. *Penny*, 44 Cal.2d 861, 879 [285 P.2d 926].) Could the jury have so found under the evidence? Defendant Finch disclaimed culpable negligence. In fact his evidence sought to establish the very opposite of the factors essential to a showing of death by culpable negligence. Accordingly in denying instructions on involuntary manslaughter the court was acting strictly in conformity with Finch's own contentions.

Defendant Tregoff next contends that the verdicts rendered against her of second degree murder in count I and of conspiracy to commit murder in count II are inconsistent as a matter of law.

The jury during its deliberations and prior to returning its verdicts, requested the trial court to answer the following question: "Does a 2nd degree verdict on Count I contradict the guilty verdict on Count II of one defendant, while the other defendant is found guilty of 1st degree on Count I and guilty on conspiracy Count II?" The trial court answered the jury's question as follows: "My answer is 'no,' there is no conflict."

In considering the jury's question the trial judge in the case before us may have considered it in the broad nontechnical sense as to whether the proposed forms of verdicts would be void and beyond the legal powers of the jury to return. Considered in that sense, his answer in the negative

was proper. The jury could, if in its wisdom it saw fit to do so, return such verdicts without rendering the proceedings void. Quite properly, the judge could have reread to the jury the instructions as to conspiracy, the degrees of murder and the responsibility of one who aids and abets another to commit an offense. But assuming he had done so the jury would still have remained in doubt as to the answer to its query which the judge apparently, and quite logically, considered to be: Would it be beyond the jury's legal power to return such verdicts? That in fact the jury actually intended to return such verdicts, if there was no legal impediment toward its doing so, was borne out by the verdicts actually returned 20 minutes later.

In *People* v. *Ditson,* 57 Cal.2d 415, 449 [20 Cal.Rptr. 165, 369 P.2d 714], the trial court was asked by the jury: " 'Assuming a criminal conspiracy to commit murder exists, would it necessarily follow that all members of that conspiracy be guilty of murder in the same degree?' " The Supreme Court held that in the circumstances of that case the affirmative answer given by the judge was proper and could not have misled the jury. In that case the defendants were not charged with both the crimes of conspiracy and murder as was done in the case before us. Thus, in *Ditson,* the answer correctly advised the jury that those who aided and abetted in the commission of the murder would necessarily be guilty of murder in the same degree. ▮ Here, there were two separate and distinct crimes. The chain of events involving the hiring of Cody and culminating in the defendants trip to West Covina, if believed by the jury, was sufficient to constitute the crime of conspiracy to commit murder. Thus, defendants Finch and Tregoff could have been found guilty of this offense entirely independently of the actual killing of Mrs. Finch.

Considered separately from the conspiracy count, under the evidence the jury could have found both defendants guilty of the crime of murder of Mrs. Finch in the second degree. They could have decided that the two had abandoned their intention to have Mrs. Finch killed or to kill her themselves and that they awaited her for their asserted peaceful purpose of talking matters over; that the actual killing by Dr. Finch was not by lying in wait or by any other kind of premeditated killing on the part of the defendants. Under these circumstances the defendants could have been found guilty of murder in the second degree. It

would not have conflicted with the jury's finding of them guilty on the conspiracy count. Thus, a verdict of guilty of defendant Tregoff of conspiracy on count II and of murder of the second degree on count I was not necessarily in conflict under the circumstances in this case; and the *Ditson* case (*People* v. *Ditson, supra,* 57 Cal.2d 415) is clearly distinguishable.

▉▉▉ The evidence showed that defendant Finch did the actual shooting, and that Tregoff aided and abetted the commission of the act. Under section 31 of the Penal Code both were equally guilty; thus, in the eyes of the law whatever crime Finch committed defeendant Tregoff committed. In that sense the verdicts of first degree as to Finch and second degree as to defendant Tregoff do conflict, but neither defendant complains on appeal of this conflict. Even if such complaint were lodged, however, a finding by the jury of defendant Tregoff guilty of the lesser offense, murder in the second degree, would not vitiate such verdicts nor be prejudicial to defendant Tregoff. It would have no adverse effect on defendant Finch. Since the evidence warranted the jury holding Tregoff guilty of murder in the first degree she cannot complain of a finding by the jury more favorable to her than the law and the evidence warranted. (*People* v. *Thompson,* 193 Cal.App.2d 620, 627-628 [14 Cal. Rptr. 512], and citations.)

As stated in *People* v. *Powell,* 34 Cal.2d 196, 205-206 [208 P.2d 974], "It cannot be doubted that a trier of fact has and often exercises the *power,* because of obvious extralegal factors or for no apparent reason, to find a defendant guilty of a lesser degree or class of crime than that shown by the evidence. Furthermore, even if it be assumed that the trier of fact erred here when he found defendant guilty only of manslaughter, defendant cannot invoke reversal on an error which is favorable to him. [Citations.] An appellant is precluded from complaining that he was convicted of a lesser offense than the one of which he is guilty according to undisputed evidence, or according to that view of the evidence which, it indisputably appears, the trier of fact accepted. [Citations.]"

▉▉▉ Even if we assume that the court erred in not giving a full explanation of its answer to the query by the jury, there remains the question of whether the character and effect of that error were such as to require a reversal under the circumstances, having due regard to the terms of section

4½ of article VI of the Constitution. We are of the opinion that it is not reasonably probable that a result more favorable to defendants or either of them would have been reached in the absence of the error complained of. If anything, the error resulted in a finding by the jury more favorable to one defendant than the law and the evidence warranted. It had no effect whatever on the other defendant, and consequently under no consideration would warrant a reversal. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant Tregoff also contends the evidence is insufficient as a matter of law to sustain the verdict of conspiracy since, if there was a conspiracy shown, it took place outside the State of California. Defendant Tregoff urges the law of California does not punish for an act committed only partly in California, unless the act amounts to an attempt.

Section 27 of the Penal Code reads in part as follows: "The following persons are liable to punishment under the laws of this state: 1. All persons who commit, in whole or in part, any crime within this state . . ."

The original object of the conspiracy was to have Mrs. Finch murdered by Cody whom defendant Tregoff contacted in Nevada. Defendant Finch traveled to Nevada and participated in arrangements with Cody. Whether or not the witness Cody actually intended to murder Mrs. Finch is of no consequence. Cody was hired and paid by defendants for the purpose of killing Mrs. Finch. He came to Los Angeles on July 3 for the express purpose of killing Mrs. Finch on July 4, the date set by defendant Tregoff. He returned to Las Vegas on the 5th of July and told her he had killed Mrs. Finch, taken her jewelry as instructed by defendant Tregoff to simulate a burglary, and left the body in the trunk of his car parked behind a school. He said he had taken photographs of Mrs. Finch in death which defendant Tregoff asked to see. He told her he would get them. It was at this time, according to Cody, she paid him $800 or $900 more. Later the defendants both talked with Cody, and Finch informed him his wife was very much alive. Finch sent Cody back to Los Angeles on July 7 saying the job had to be done. Cody returned to Las Vegas the next day and told defendants he had hired someone to kill Mrs. Finch and would telephone Finch when the job

was done. Again Finch gave him $100 to "take care of it personally." Cody did nothing further.

Thus the evidence disclosed defendants Finch and Tregoff conspired partially in Clark County, Nevada, and partially in Los Angeles County, to kill Mrs. Finch and in furtherance of this conspiracy they did in fact drive from Las Vegas to West Covina, California. It is apparent that the jury drew the inference from the evidence that the crime of conspiracy was committed by the defendants partly in Nevada and partly in California. ▉▉▉ Direct evidence is not required to establish a conspiracy. Circumstantial evidence may be relied upon. Experience has demonstrated that as a general proposition a conspiracy can only be established by circumstantial evidence. It is most significant that when defendant Tregoff discovered Jack Cody had not kept his bargain to kill Mrs. Finch, defendant Tregoff told him, "Well, Jack, if you don't do it the doctor will do it, and if the doctor doesn't do it, I'll do it." All the elements of conspiracy were proved.

The voluminous record reveals the defendants were fairly tried. The evidence of their guilt is clear and convincing. Judgments of convictions and orders denying the motions for new trial are affirmed.

Burke, P. J., concurred.

FORD, J.*—I concur in the determination that each judgment of conviction must be affirmed. However, in my judgment an erroneous answer was given by the court to the jury in response to the jury's question as to whether "a second degree verdict on count 1," the murder charge, would "contradict the guilty verdict on count 2 [the conspiracy charge] of one defendant while the other defendant is found guilty of first degree on count 1 and guilty on conspiracy count 2." (See *People* v. *Ditson,* 57 Cal.2d 415, 449 [20 Cal.Rptr. 165, 369 P.2d 714]; *State* v. *Ochoa,* 41 N. M. 589 [72 P.2d 609, 614-615].) Error of that nature makes necessary a careful consideration of the record for the purpose of determining whether it was prejudicial. In this case it does not appear to be reasonably probable that a result more favorable to either of the defendants would have been reached in the absence of such error. Consequently, it cannot be said that there has been a miscarriage of justice. (See *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

---

*Assigned by Chairman of Judicial Council.

The petition of appellant Tregoff for a rehearing was denied April 3, 1963, and appellants' petitions for a hearing by the Supreme Court were denied May 8, 1963.